## Puritan Coke Company *v.* Clark, Appellants.

*Contract of sale—Breach—Measure of damages.*

In a contract for the delivery of chattels upon a special stipulation as to quantity and quality, where the vendor is ready and willing to deliver, the measure of damages is the difference between the contract price and the cost of manufacturing and delivery. Where on a resale he receives more than the cost of manufacturing, he is entitled to the difference between the price it sold for and the contract price.

When the subject of a contract of sale at a fixed price is an article to be manufactured by the vendor, liable to depreciate in value (such as coke) having no real market in ordinary times, and only manufactured in quantities upon orders by consumers, the mere fact that at the time of the breach of the contract by the vendee's refusal to accept delivery, there was a price at which the vendor had been able to affect sales of the article, is not controlling in fixing the measure of damages, but the vendor will be entitled to recover the difference between what it would cost him to manufacture and deliver the article under the contract, and the contract price.

A coke company entered into a contract to deliver a very large quantity of coke upon daily deliveries during a specified period. After the coke had been delivered and paid for at the contract price, the vendees refused to accept further deliveries alleging a ground which the jury found to be insufficient. At the time of the breach the vendor had manufactured and on hand about one third of the balance to be delivered. It did not manufacture the remaining two thirds. It appeared that coke is an article which deteriorates and depreciates in value when kept on hand. It also appeared that there was no general market for the coke at the time of the breach, and that the vendor only succeeded in selling what it had on hand in small lots at a price much below the contract price. There was evidence that the vendor, in view of the large contract, had erected additional miners' houses, added largely to the number of its coke ovens, and in many other particulars increased its capacity. *Held,* that the vendor was entitled to recover for the coke which it had manufactured and sold to other parties, the difference between the selling price and the contract price, and that as to the coke not manufactured it was entitled to receive the difference between the cost of manufacture and the contract price.

Argued Nov. 4, 1902.   Appeal, No. 66, Oct. T., 1902, by defendants, from judgment of C. P. No. 3, Allegheny Co., Aug. T., 1899, No. 470, on verdict for plaintiff in case of Puritan Coke Company v. John M. Clark and Charles S. Guthrie, trading as Naylor & Company.   Before MITCHELL, DEAN, FELL, BROWN and POTTER, JJ.   Affirmed.

Assumpsit for breach of contract of sale.   Before EVANS, J. The facts appear by the Supreme Court.

The court charged in part as follows :

Under ordinary circumstances, where there is a breach of contract for the sale and delivery of personal property, the measure of damages is the difference between the market price at the time of the breach of the contract and the price at which the parties had agreed that the personal property or chattels should be delivered.   But that supposes that there is a market for the sale of the personal property in dispute.   [The evidence in this case shows conclusively that coke in quantities is sold on contracts that are made before delivery is commenced, and covering a period of some months, usually six months' time in the delivery; that there is practically no open market at which furnace coke can be sold in any quantities.   There were some 21,000 tons of this coke undisposed of, not taken by the defendants; and there is no evidence in this case that would justify you in finding that there was such a market for this coke that the plaintiff could have disposed of it during the month of June.   Therefore, I charge you that in this case the difference between the market price and the contract price is not the measure of damages, because it would not help the plaintiff in this case if the market price was $1.50 per ton if it could not sell its coke.   But there is another way of arriving at the question as to how much the plaintiff was injured in this case, of course, assuming that it was injured at all, and that is the difference between what it cost the plaintiff to manufacture this coke and the price at which the defendants had agreed to take it; and that, I charge you, is the measure of damages in this case.

You have the testimony on the subject of what it cost to manufacture this coke.   There is no dispute as to what the

defendants were to pay for the coke under the contract, that is, $1.50 per ton.   If you find that the plaintiff is entitled to recover, then its damages will be the difference between what it cost to manufacture this coke and the price that these defendants had agreed to pay for it.] [1]

There is another element, however, which you will take into consideration.   There was some of this coke manufactured at the time of the breach ; and the plaintiff sold that coke.   If it sold that coke for more per ton than it cost to manufacture it, then the difference between what it received per ton for that coke and the cost of its manufacture should go as a ciedit upon the amount which the plaintiff would otherwise be entitled to recover, under the instructions which I have given you as to the measure of damages.   I believe it is accepted in this case that it sold that 7,300 tons for something over $7,400, which would be about $1.01 a ton for the 7,300 tons.   Now, if they got fairly all that could be gotten for the coke, and that was as low as or less than the cost price, then that item does not enter into the question of damages at all.   I believe, if you find that that was a fair price for the coke, that it was as low as the lowest evidence here of the cost of its manufacture ; but it is for you to determine, under the evidence, whether they should have gotten more for that coke than they did, and whether that was above or below the cost of manufacture.   If it was above the cost of manufacture, or if they should have fairly gotten more than the cost of manufacture, then, to that extent, the defendants would be entitled to a credit on the amount of damages as determined by the measure of damages for the entire case which I have given you.   In order that I may make myself clear, you start out in the consideration of this case with the one question presented to you.   This coke was to be suitable for making Bessemer pig iron.   If it was suitable for making Bessemer pig iron, then it was the duty of the defendants to accept it; and their refusal to accept it would be a breach of the contract for which they would be liable in damages.   If it was unsuitable for the manufacture of Bessemer pig iron by reason of the phosphorus in it being too high (because that is the only question here, the question of its strength and other questions which enter into the suitableness of coke for making pig iron not being in dispute)—if it was unsuitable for making

Bessemer pig iron by reason of the phosphorus in it being too high, then the defendants had a right to rescind the contract and refuse to receive any more coke. That is the first question which you will determine. If you determine that question in favor of the defendants, that is, find that the coke was not suitable for making Bessemer pig iron, then your verdict should be for the defendants, and you quit right there.

If you find that it was suitable for making Bessemer pig iron, then the next question you will determine is the damages, and you will determine them upon the lines that I have laid down to you in my charge. You will determine the damages in accordance with the measure, that is, the way to compute the damages, which I have given you in the former part of my charge.

Defendants' counsel has asked me to charge you as follows:

2. The measure of damages in this case is the difference between the market price and the contract price at the time and place of delivery. *Answer:* That point is refused. [4]

6. That if the plaintiff intended to hold the defendants liable for damages in this case, it was its duty to so notify them, and to sell the undelivered coke for their account at the market price; and if there was no market for immediate delivery, but was a market for contracts in May and June, it was its duty to dispose of this coke on contract at the market price. In that case, its measure of damages is only the loss in the delay in payments in the way of interest and the costs of storage. *Answer:* That point is refused. [5]

7. That there is no evidence in this case of loss on 14,000 tons of coke undelivered, and there can be no recovery in damages as to such 14,000 tons. *Answer:* That point is refused. [6]

8. That under the law and evidence in this case their verdict must be for the defendants. *Answer:* That point is refused. [7]

The jury, after being out for about an hour, returned for additional instructions, when the court charged them as follows:

Gentlemen: I tried to make myself clear on the measure of damages which the plaintiff is entitled to recover, if it is entitled to recover anything; that is, the difference between

what it had cost to produce this coke and the price of the coke as specified in the contract, provided that if the plaintiff either did sell or should have sold the 7,300 tons of coke for more than it cost to produce it, then the defendants are entitled to a credit for that excess.    Let me illustrate, and take figures which cannot apply to this case at all : Supposing it should have sold this 7,300 tons of coke for $2.00 a ton, and it only cost· it $1.00 a ton to produce it, then on the amount which you would find the plaintiff was entitled to recover, basing your calculation on the difference between the cost of producing the 21,000 tons of coke and the $1.50 per ton, the contract price, the defendants would be entitled to a deduction of $1.00 a ton, the difference between the $2.00 that the plaintiff sold the 7,300 tons for and the $1.00 which it cost to produce it.    Now, those are purely imaginary figures, because there are no such figures as that in the case ; consequently I used them, so far from the actual figures, that they would not mislead you.    [The first proposition is that the measure of damages in this case is the difference between what it would have cost this plaintiff to have produced this coke, if it had gone on and manufactured it, and the $1.50 per ton which the defendants, under their contract, agreed to pay for it; that is, the plaintiff is entitled to recover the profit which it would have made if it had gone ahead and produced it and turned it over to the defendants.] [3] From that, if you find that it sold or should have sold the 7,300 tons for more than it cost to produce it, the defendants are entitled to a deduction of just that difference between what it sold for and what it cost to produce it.

Verdict and judgment for plaintiff for $10,290.    Defendants appealed.

*Errors assigned* were (1, 3-7) above instructions, quoting them.

*J. J. Miller*, with him *John L. Prestly* and *Harry J. Nesbit*, for appellant.—In actions for a breach of contract in order to enable plaintiff to recover more than nominal damages, actual loss sustained must be shown by competent evidence and with reasonable certainty.

The court, in charging the jury that this was a commodity

that did not command a general market price, and in further instructing them that the evidence which they had heard dared not be considered, caused this erroneous verdict: Stauffer v. Miller Soap Co., 151 Pa. 330.

The court should have permitted the evidence to be passed upon by the jury, and should have instructed the jury that if they believe that the plaintiffs could have sold the remaining 21,000 tons on contract for future delivery, that it was their duty to do so, and that the defendants would be liable for the difference between what was received for it and the contract price, including loss of interest, cost of handling and all other incidental expenses: Herdic v. Young, 55 Pa. 176; Coxe v. England, 65 Pa. 212; Coleman's Appeal, 62 Pa. 252; Morrison v. Robinson, 31 Pa. 456; Theiss v. Weiss, 166 Pa. 9; Arnold v. Blabon, 147 Pa. 372; Forsyth v. Palmer, 14 Pa. 97.

*Edwin W. Smith*, with him *George E. Shaw, J. H. Reed* and *J. H. Beale*, for appellee, cited: Todd v. Gamble, 148 N. Y. 382 (42 N. E. Repr. 982); Hinkley v. Pittsburg Bessemer Steel Co., 121 U. S. 264 (7 Sup. Ct. Repr. 875); U. S. v. Behan, 110 U. S. 338 (4 Sup. Ct. Repr. 81); Gallagher v. Whitney, 147 Pa. 184; Unexcelled Fire Works Co. v. Polites, 130 Pa. 536.

OPINION BY MR. JUSTICE DEAN, January 5, 1903:

In September, 1897, plaintiff and defendant made the following contract:

" Puritan Coke Company, Pittsburg, Pa., agree to sell and Messrs. Naylor & Company, Pittsburg, Pa., agree to buy forty-five thousand (45,000) tons of 2,000 pounds Pennsylvania Railroad weights, Puritan-Connelsville coke suitable for making Bessemer pig iron.

" Time of delivery: 300 tons per day or 7,500 tons per month for the first six months of 1898.

" Price: $1.50 per tons of 2,000 pounds, f. o. b. cars Baggaley Pa., Southwestern Pennsylvania Railroad.

" Terms: Monthly settlements in cash on the 15th day of each month.

" Strikes, accidents or causes beyond our control to be sufficient excuse for any delay in any shipment.

"This contract shall terminate on the 30th day of June, 1898, whether the total amount of coke specified above has been shipped or not, unless the parties hereto shall otherwise agree in writing."

Under this contract the coke company delivered to Naylor & Company up to May, 1898, 24,000 tons of coke and were paid the contract price.   At that date Naylor & Company notified the coke company they would not receive any more coke because on account of an excess of phosphorus, it did not come up to the standard in quality, specified in the contract, and it was not suitable for the manufacture of Bessemer iron, thus leaving at the date of the notice 21,000 tons undelivered.   Seven thousand three hundred tons had been manufactured but was on the wharves at the ovens.   The coke company, alleging an unwarranted breach of the contract by defendants, brought this suit in assumpsit to recover damages and obtained a verdict in the court below for $10,290.   Defendants bring this appeal assigning seven errors ; the first alleges an unwarranted assumption of fact in the charge ; second, that evidence was excluded which was material to the issue ; the third, fourth, fifth and sixth allege error in the instruction of the court on the measure of damages ; the seventh, that the court erred in not directing a verdict for defendants.

It will be noticed the contract provides for the delivery of "Puritan-Connelsville Coke suitable for making Bessemer pig iron."   Defendants set up as the excuse for refusing to receive the remaining 21,000 tons, that it was not suitable for making that grade of iron.   This, then, became a pure question of fact for the jury and much of the testimony bore on it; on correct instructions the court submitted the evidence to the jury, saying plainly to them, that if the coke was not suitable for the manufacture of Bessemer pig, they should find for defendant ; their verdict shows the jury found it was suitable, therefore, there was no lawful excuse for defendants' refusal to receive the remaining 21,000 tons of the contract quantity.

The specifications of error, except the second, all in substance relate to the question of damages and can be discussed together.   As to the first the court used this language to the jury : "There were some 21,000 tons of this coke undisposed of, not taken by the defendants ; and there is no evidence in this

case that would justify you in finding, that there was such a market for this coke that the plaintiff could have disposed of it during the month of June."

It was the undisputed evidence that coke generally, is sold on contracts covering a fixed number of months ; it was not a stock product like flour and sugar ; preparation for coal mining, ovens and different kinds of labor must be made in reliance upon a contract covering months of output ; in this case it was made to cover the first six months of 1898 ; there may be made sales of small lots of coke on the wharf, but such sales are very uncertain as to quantity and price ; no iron manufacturer would start his furnace relying on such an uncertain supply ; no coke manufacturer, except from some imperative necessity, stocks coke upon his wharves in anticipation of such sales ; this substantially is the testimony of all the witnesses who had knowledge of the business.   The court below therefore committed no error in the language complained of.

The third, fourth, fifth and sixth assignments all allege error in the court's instructions as to the measure of damages which should be adopted by the jury in case they found for plaintiff, on the refusal by defendants to accept the 21,000 tons.   On this question the court charged as follows :

" I charge you that in this case the difference between the market price and the contract price is not the measure of damages, because it would not help the plaintiff in this case if the market price was $1.50 per ton if it could not sell its coke. But there is another way of arriving at the question as to how much the plaintiff was injured in this case, of course assuming that it was injured at all, and that is the difference between what it cost the plaintiff to manufacture the coke and the price at which defendants had agreed to take it, and that I charge you is the measure of damages in this case."

We concur with appellant's counsel in his argument, that for a breach of contract the general rule for damages is to put the party in the same position as if the breach had not occurred ; but the question in this case still remains, how ? The market price is based almost wholly on contracts running on weekly or monthly deliveries covering long periods ; the evidence shows that at the date of the breach no such contracts could be made for 21,000 tons, for there was no market

price for it.   If plaintiff could have found other buyers to take for immediate delivery or within a short time, the 21,000 tons at the contract price, $1.50 per ton, on the contract terms, it would have been bound to sell to such buyers, although several well considered cases do not place that obligation on the vendor ; but there is no evidence that such buyers could have been found.   There were on hand stocked on the wharf, when the contract was broken, about 7,300 tons ; it took plaintiff, using every reasonable effort, four months to sell this in small lots at prices ranging from ninety cents to $1.30 per ton, averaging $1.01 per ton.   This coke had deteriorated to some extent in quality by being stocked on the wharf; the furnace man wants as nearly pure carbon as he can get to dump into his furnace head ; stocked coke absorbs moisture, gathers ashes and dirt and its price is thus depreciated.   Plaintiff, therefore, could not be put in the same position by continuing to manufacture the remaining quantity on this contract.   There are some products, which owing to their particular uses are unsalable, except on special contracts for purchase and delivery. A builder purchases according to a schedule of lengths and sizes many thousand feet of lumber at so much per thousand ; the lumbermen takes it to the forest and cuts down the timber into lengths, then transports it to the sawmill where it is cut into the proper sizes ; if the builder violates his contract, the lumberman cannot sell it to others because it suits no other builder, yet at the time the contract was made the market price of bill lumber was that to be paid under the contract.   The same with structural steel and some other products of the factory.   There was a market for this coke by the terms of delivery under that contract when it was made ; practically there was no other market when the contract was broken.

The difference between the delivery price and the price it could have been sold for at the wharf when the 21,000 tons were to be delivered, was far less than the contract price and as to some lots less than the cost of manufacture, and would by no means have put plaintiff in the same situation as before the contract was broken.   In Ballentine v. Robinson, 46 Pa. 177, the court below charged the jury : " That where the manufacturer of an article ordered has completed it, and upon notice of its completion the buyer refuses to accept or pay for it, the

measure of damages is the contract price.'' This court held the instruction correct, STRONG, J., saying: '' And why should they without fault of their own be subject to the risk and trouble of a re-sale for defendant's benefit ? . . . . and such is the doctrine laid down in the better decisions," citing Parsons on Contracts and Sedgwick on Damages. In Unexcelled Fireworks Co. v. Polites, 130 Pa. 536, CLARK, J., discussing the same question says: " The manifest tendency of the cases in the American courts now is to the doctrine, that when the vendor stands in the position of a complete performance on his part, he is entitled to recover the contract price as his measure of damages." To the same effect is Gallagher v. Whitney, 147 Pa. 184, and Hinckley v. Pittsburg Bessemer Steel Co., 121 U. S. 264.[1] In these cases the chattels to be paid for under the contract were practically valueless, when the buyer refused to accept them; that cannot be said of coke; it was worth something, although much less than the contract price when the breach occurred. The law therefore is and ought to be, that in a contract for the delivery of chattels upon a special stipulation as to quantity and quality, where the vendor is ready and willing to deliver, the measure of damages is the difference between the contract price and the cost of manufacture and delivery. Where on a re-sale he receives more than the cost of manufacture, he is entitled to the difference between the price it sold for and the contract price.

But it is argued by appellant, while such a rule if adopted might apply to the 7,300 tons manufactured and ready for delivery on the wharf, it ought not to apply to the almost 14,000 tons not yet manufactured. The application of the rule does not depend on the exact state of manufacture of the thing sold at the date of the breach, but on the uncertainty incident to the adoption of any other that the contract price as the measure of damages. Plaintiff was bound to make a sale of the coke on the wharf and did make a sale at the best price it could get for it and credited defendants with that price; but it was not bound to go on and manufacture 14,000 more tons and also sell that at a greatly reduced price, perhaps less than the cost of manufacturing it, as it actually did sell a part of the 7,300 tons.

---

[1] Also reported in 7 Sup. Ct. Repr. 875.—Reporter.

"When the subject of a contract of sale, at a fixed price, is an article to be manufactured by the vendor, perishable in its nature when kept for any length of time (such as silicate of soda) having but a limited demand and no real market, and only manufactured in quantities upon orders by consumers, the mere fact that at the time of the breach of the contract by the vendee's refusal to accept delivery, there was a price at which the vendor had been able to affect sales of the article, is not controlling in fixing the measure of damages, but the vendor will be entitled to recover the difference between what it would cost him to manufacture and deliver the article under the contract and the contract price:" Todd v. Gamble, 148 N. Y. 182.[1]

In Imperial Coal Co. v. Port Royal Coal Co., 138 Pa. 45, the facts were about these : Plaintiff had a plant of sixty coke ovens not in operation and many of them out of repair; the defendant operated a coal mine; they entered into a contract by which defendant agreed to supply plaintiff with slack coal sufficient to run the ovens at their full capacity for six months in the year, plaintiff to be paid $1.00 per ton of coke for manufacturing it; plaintiff at great expense repaired his ovens and made ready to perform his side of the contract; at the end of three weeks defendant refused to supply more coal and at no time furnished sufficient to keep the ovens going. While the ovens were in operation 445 tons of coke had been made. Plaintiff brought suit for damages claiming $1.00 per ton, the contract price, for the coke actually manufactured and the profits he would have made if he had operated the ovens for the entire six months under the contract, which the evidence showed would have been about fifty cents per ton. The court below charged the jury thus : "If you believe the contract was an entire contract, that the coal was to be sufficient in quantity to keep the plaintiff's sixty ovens in operation for a period of six months at $1.00 per ton, and the defendant failed to comply with the contract, the plaintiff would be entitled to the profits that he lost by reason of defendant's fault." On appeal by defendant, this was specially assigned for error, but in the opinion affirming the judgment we said, as to this assign-

---

[1] Also reported in 42 N. E. Repr. 982.—Reporter.

ment: " While it is undoubtedly true, that mere speculative profits cannot be recovered in an action for breach of contract, a careful examination of the assignment shows that the profits in question were not within this rule. The jury have found the contract to be as plaintiff alleged. . . . The profits were not speculative; they did not depend upon the fluctuations of the market or the demand for coke, and they could be ascertained with mathematical accuracy. As the plaintiff corporation was obliged to equip itself at a heavy expense to perform the contract, it is only just upon its breach, it should recover for the net profits which it certainly would have made."

On the evidence before us, there is ample room for the application of precisely the same principle. The appellee, in view of its large contract for coke with defendants, erected additional miners' houses, added largely to the number of its coke ovens, and in many other particulars increased its capacity to meet its increased output; why is not the contract price the just measure of its damages deducting the cost of manufacture? It is argued, the coke in the form of coal remained in the ground for future use. There would be some force in this if plaintiff were a capitalistic corporation investing in coal lands depending on the future appreciation in the value of land for its profits; but it had not invested for that purpose; it was a manufacturing corporation investing in what might be called the raw material (coal) to be soon manufactured and sold in the shape of a new product. Its large capital was invested in coal, miners' houses and coke ovens for but the one purpose, of making its profits out of the manufacture of coke. We see no error on the facts of this case in the charge of the court below on the measure of damages, nor do we see that any injustice resulted to defendant. A computation shows, clearly, that the jury awarded plaintiff the difference between the contract price and the sales price on the 7,300 tons on the wharf; and the difference between the contract price and the cost of manufacture on the remaining 14,000 tons which in justice and law the defendants ought to pay.

Appellant's second assignment is to a ruling on an offer of evidence. The offer was to prove what contracts could have been made in June and July of 1898 for future delivery. This was wholly immaterial. Plaintiff was under no obligation to

defendants to make contracts for future delivery; their contract called for delivery the first six months of that year; that time had about expired; could they then have sold it in the market for the contract price? That was the material and only material fact to be ascertained. All the assignments of error are overruled and the judgment is affirmed.