### In re DUQUESNE INCANDESCENT LIGHT CO.

(District Court, W. D. Pennsylvania. March 8, 1910.)

#### No. 4,253.

1. BANKRUPTCY (§ 322*)—CLAIMS AGAINST ESTATE—CONTRACT—BREACH—BANK-RUPTCY—MEASURE OF DAMAGES.

For a buyer's breach of a contract for the manufacture and sale of burners the measure of the seller's damage on the allowance of his claim against the bankrupt estate of the buyer is the difference between the cost of manufacture and the contract price, notwithstanding the entire lot of goods were not manufactured or ready for delivery.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 508; Dec. Dig. § 322.*]

2. BANKRUPTCY (§ 340*)—CLAIMS—BREACH OF CONTRACT—OBJECTION TO CLAIM—BURDEN OF PROOF.

Where a buyer's bankruptcy constituted a breach of a contract to purchase a quantity of burners to be manufactured by the seller, and, after the bankruptcy, the seller was compelled to purchase mantles, boxes, cases, glasses, and excelsior to complete the burners manufactured and prepare them for market, and also to furnish a market for them, which it was

---

not required to do under the contract, the seller, in order to establish its claim for the difference between the cost of manufacture and the contract price, was not bound to show what amount was obtained for the burners so manufactured and sold to others; the burden of proving such sales in mitigation of damages being on the objectors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

3. BANKRUPTCY (§ 318*)—CLAIMS—CONTRACT OF SALE—BREACH—"PROVABLE CLAIM."

Where a buyer's bankruptcy resulted in its breach of an express written contract for the sale of burners, the seller's damages were unliquidated and constituted a "provable claim" against the bankrupt's estate, under Bankr. Act July 1, 1898, c. 541, § 63a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3447), providing that debts of the bankrupt may be proved and allowed against his estate which are founded on a contract, express or implied.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 482; Dec. Dig. § 318.*

For other definitions, see Words and Phrases, vol. 6, p. 5746.]

4. BANKRUPTCY (§ 320*)—CLAIMS—DAMAGES—LIQUIDATION.

Where a bankrupt was liable for unliquidated damages for breach of contract of sale, and no application was made to the court for a liquidation, and there was no standing order or rule providing a method of procedure for a jury trial on issues framed, or by adjudication on evidence before the referee or judge, the parties having submitted the matter to the determination of the referee, his determination constituted an appropriate method of liquidating the damages, under Bankr. Act July 1, 1898, c. 541, § 63b, 30 Stat. 563 (U. S. Comp. St. 1901, p. 3447), providing that damages may be liquidated on application to the court in such manner as it shall direct.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 479, 480; Dec. Dig. § 320.*]

5. BANKRUPTCY (§ 318*)—CLAIMS—CONTRACT OF SALE—BREACH—TENDER OF DELIVERY.

Where a contract for the sale of burners was broken by the buyer's bankruptcy, so that it was impossible for the buyer to accept a delivery and make payment, the contract was broken on the filing of the petition, and the seller was relieved from tendering the goods as a condition to claiming damages against the bankrupt's estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 481, 482; Dec. Dig. § 318.*]

In the matter of the bankruptcy of the Duquesne Incandescent Light Company. On certificate of the referee to review certain questions with reference to the disallowance of the claim of the Iron City Stamping Company. Referee's report reversed, and claim allowed.

Charles T. Moore, for claimants.

Alex. Gilfillan and C. F. Patterson, for trustee.

YOUNG, District Judge. This case comes before us upon the report of Wm. R. Blair, referee in bankruptcy, and his certificate presenting for our review certain questions. As all these questions except the fourth are questions of fact, we do not find, after a careful consideration of the evidence, that the referee erred in his decision allowing or disallowing the claims. His findings are abundantly sustained by the evidence, and, were the case before us originally, we

should have decided as he has. This leaves only the fourth question to be considered. That question is stated as follows:

"Fourth. Whether, under the facts set forth in the report and opinion of the referee filed herewith, the claim of the Iron City Stamping Company for damages for breach of contract to manufacture certain burners should be allowed against said estate."

The claim was disallowed by the referee. In his report upon this claim the referee says:

"The claimant in this case claims the sum of $11,659.33, which it says is due to it by reason of the breach of a certain contract by the bankruptcy of the Duquesne Incandescent Light Company.

"It appears that on February 15, 1908, Messrs. J. H. Lytle and Charles T. Moore, on the one part, and the bankrupt, on the other, entered into a contract, in writing, whereby the bankrupt ordered 250,000 brass burners of a certain type known as the 'Venus Burners,' at $145 per thousand (1,000), the burners to be manufactured and delivered at the rate of 35,000 per month from June 15th until November 15th and the final delivery of 40,000 in December, 1908. The bankrupt was to furnish certain material used in the manufacture of the burner, and the contract further provided for certain terms of payment, etc. Subsequently to entering into this contract, Messrs. Moore & Lytle incorporated the Iron City Stamping Company, the claimant in this case, and certain property of Messrs. Moore & Lytle, including this contract, was turned over to the Iron City Stamping Company.

"It appears in the testimony that Moore & Lytle or the Iron City Stamping Company provided themselves with the necessary dies and other appliances proper for the fulfillment of the contract, and did actually manufacture a number of the burners substantially as called for in the contract. It further appears, as the witness Hellquist, an employé of the claimant company, testifies, that the number manufactured was 5,000, but he refuses to say that the number reached 10,000. On the other hand, H. L. Schueck, who was formerly president of the Duquesne Incandescent Light Company, but who between the date of the contract and the manufacture of the burners became the manager of the claimant company, says that no burners of the kind called for by the contract were ever manufactured. Schueck testifies that the burners which were manufactured of the parts assembled for carrying out the contract with the bankrupt were sold by the claimant for more than they cost. It does not appear for what they were sold. Hellquist testifies that the cost of manufacturing the burners, as called for by the contract, was $90 per thousand (1,000). Schueck says the cost was from $88 to $92 per thousand (1,000). The claim as made is for $11,659.33, which is arrived at as follows:

| | | |
|---|---|---|
| 250,000 brass burners @ $145 per 1,000, as per contract | | $36,250 00 |
| Less 250,000 burners, cost at factory $90 per 1,000 | $22,500 00 | |
| And the value of material advanced by the bankrupt company | 2,090 67 | |
| Total | | 24,590 67 |
| Balance due claimant | | $11,659 33 |

"The claim in this case, therefore, is for the difference between the contract price and the alleged cost of the manufacture of the entire 250,000 burners; the learned counsel for the claimant arguing that such is the proper measure of damages in this case.

"The referee is of opinion that this claim cannot be allowed. While it is true that in certain cases on the refusal of the purchaser to receive or pay for articles manufactured of a special or peculiar type the measure of damage is held to be the difference between the contract price and the cost of manufacture, the referee is of the opinion that this is not the measure of damages to be applied in this case.

"In the first place, this is not the case of an actual refusal to accept and pay for the articles; and, in the second place, the vital defect in the claim as

presented is that the cost of the manufacture is not sufficiently proved. While the referee does not hold that in case of the bankruptcy of the person ordering the goods, as in this case, the other party is bound to go on and manufacture and tender the same in order to recover the difference between the cost of manufacture and the contract price, yet the rule allowing the recovery of such damages is always based upon a theoretical tender, and the referee knows of no case in which upon the insolvency of the purchaser the manufacturer is permitted upon the mere estimated cost of production to recover the difference between such estimated cost and the contract price. In such cases the referee is of opinion that the measure of damages is the actual loss rather than the speculative difference between the estimated cost of production and the contract price. It must not be forgotten that in this case the testimony is clear that the burners alleged to have been manufactured, under the contract, sold for more than the estimated cost of manufacture, although the witnesses do not inform us of the price at which they were sold.

"The referee is of opinion that this claim, as made, cannot be allowed, nor does the evidence show the actual loss to the claimant by reason of the breach of its contract."

The evidence in this case fully establishes that the contract was entered into between the claimant and the bankrupt by which the stamping company was to furnish 250,000 inverted brass burners, as per sample submitted, for $145 per thousand, of a special design, and that there was no open or general market where the burners could be readily sold, and that the claimant made all the preparations necessary to perform the contract at considerable expense.

The evidence shows that the cost of production was about $90 per 1,000. Mr. Schueck testifies on page 26:

"Q. What is the cost of the manufacture of that burner?   A. Between $88 and $92. It varies on account of brass going up and down."

Mr. Hellquist, on page 20, testifies:

"Q. What is the cost of material for manufacturing that burner?   A. $90 a thousand.
"Q. How do you arrive at that?   A. The tubing at $22 a thousand and the shadeholder at $14 a thousand, the spud at $18, the shutter at $4.
"Q. What about the labor?   A. About $10 approximately.
"Q. All the overhead expense?   A. That was partly included. Then there were screws, mantle holders. We would figure at $90."

There was no testimony offered to contradict this evidence. There was sufficient evidence, therefore, to warrant the conclusion that the cost price was at least $90, and the referee's finding that there was not, we think, was wrong.

Under the facts of this case, we are also of the opinion that the true measure of damage is the difference between the cost of manufacture and the contract price, and this although the entire lot of goods were not manufactured and ready for delivery. The rule in Pennsylvania, the place of the contract, is well settled. In Dynamo & Engine Co. v. Cement Co., 221 Pa. 160, 70 Atl. 557, 18 L. R. A. (N. S.) 613, the rule is thus laid down:

"The first question raised by the assignments of error is as to the measure of damages. The trial judge charged the jury that, if they were satisfied from the evidence that the engines were manufactured from special designs for a special purpose and had no fixed market value, the plaintiff would be entitled to recover the difference between the actual cost of manufacturing and delivering the engines and the contract price. The learned trial judge correctly stated the rule applicable to such a state of facts as this, where from the na-

ture of the article there is no market in which it can readily be sold. In such case the great weight of authority is to the effect that the measure of damages is the difference between what it would cost to make and deliver the article and the price which the purchaser has agreed to pay for it. The principle is thus stated in 2 Sedgwick on Damages (8th Ed.) § 618, p. 269: 'Where one engaged in the performance of a contract is wrongfully prevented by the employer from completing it, the measure of damages is the difference between the price agreed to be paid for the work and what it would have cost the plaintiff to complete it. Differently stated, the rule in such case is recompense to the plaintiff for the part performance, and indemnity for his loss in respect to the part unexecuted. The plaintiff is to be placed in the same condition he would have been in if he had been allowed to proceed without interference.' This rule gives to the party who has complied with the agreement the value of his bargain. In the present instance the amount which was lost to the plaintiff by reason of the breach of the contract was capable of being ascertained with reasonable certainty, and was therefore properly adopted as the measure of the damages to be recovered by it as the injured party from the one in default."

In Imperial Coal Co. v. Port Royal Coal Co., 138 Pa. 45, 20 Atl. 937, it is said:

"While it is undoubtedly true that mere speculative profits cannot be recovered in an action for breach of contract, a careful examination of the assignment shows that the profits in question were not within this rule. The jury have found the contract to be as plaintiff alleged; that it was an entire contract: that the defendant was to furnish plaintiff with enough coal to keep its 60 ovens in operation for 6 months, and that the price was to be $1 per ton. The profits in such case were not speculative. They did not depend upon the fluctuations of the market, or the demand for coke, and they could be ascertained with mathematical accuracy."

This language was quoted with approval in Puritan Coke Co. v. Clark, 204 Pa. 556, 54 Atl. 350. In that case the court further said:

"In Unexcelled Fireworks Co. v. Polites, 130 Pa. 536 [18 Atl. 1058, 17 Am. St. Rep. 788], Clark, J., discussing the same question, says: 'The manifest tendency of the cases in the American courts now is to the doctrine that, when the vendor stands in the position of a complete performance on his part, he is entitled to recover the contract price as his measure of damages.' To the same effect is Gallagher v. Whitney, 147 Pa. 184 [23 Atl. 560], and Hinckley v. Pittsburg Bessemer Steel Co., 121 U. S. 264. [7 Sup. Ct. 875, 30 L. Ed. 967]."

In considering the application of this rule to coke not manufactured the court said:

"But it is argued by appellant, while such a rule, if adopted, might apply to the 7,300 tons manufactured and ready for delivery on the wharf, it ought not to apply to the almost 14,000 tons not yet manufactured. The application of the rule does not depend on the exact state of manufacture of the thing sold at the date of the breach, but on the uncertainty incident to the adoption of any other than the contract price as the measure of damages. Plaintiff was bound to make a sale of the coke on the wharf, and did make a sale at the best price it could get for it and credited defendants with that price; but it was not bound to go on and manufacture 14,000 more tons and also sell that at a greatly reduced price, perhaps less than the cost of manufacturing it, as it actually did sell a part of the 7,300 tons."

The same rule obtains in the United States court. The rule as laid down in United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168, is as follows:

"The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the

breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely, first, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract. The second item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. But when in the language of Chief Justice Nelson, in the case of Masterton v. Mayor of Brooklyn, 7 Hill [N. Y.] 69 [42 Am. Dec. 38], they are 'the direct and immediate fruits of the contract'; they are free from this objection; they are then 'part and parcel of the contract itself,' entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation.' Still, in order to furnish a ground of recovery in damages, they must be proved. If not proved, or if they are of such a remote and speculative character that they cannot be legally proved, the party is confined to his loss of actual outlay and expense. This loss, however, he is clearly entitled to recover in all cases, unless the other party, who has voluntarily stopped the performance of the contract, can show the contrary."

See, also, Hinckley v. Pittsburg Steel Co., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967.

We quote from the syllabus:

"The defendant agreed in writing to purchase from the plaintiff rails to be rolled by the latter, 'and to be drilled as may be directed,' and to pay for them $58 per ton. He refused to give directions for drilling, and, at his request, the plaintiff delayed rolling any of the rails until after the time prescribed for their delivery, and then the defendant advised the plaintiff that he should decline to take any rails under the contract. Held, (1) the defendant was liable in damages for the breach of the contract; (2) the plaintiff was not bound to roll the rails and tender them to the defendant; (3) the proper rule of damages was the difference between the cost per ton of making and delivering the rails and the $58."

In discussing the question Mr. Justice Blatchford, on page 274 of 121 U. S., on page 879 of 7 Sup. Ct. (30 L. Ed. 967), says:

"Under these circumstances, the defendant is estopped from insisting that the plaintiff should have undertaken the risk and expense of actually making and selling the rails. These considerations also show that the rule of damages adopted by the Circuit Court was the proper one. It was in accordance with the rule laid down by this court in Philadelphia, Wilmington & Baltimore Railroad Company v. Howard, 13 How. 307 [14 L. Ed. 157]. In that case a contractor for the building of a railroad sued the company for its breach. On the question of damages this court said (page 344 of 13 How. [14 L. Ed. 157]): 'It must be admitted that actual damages were all that could lawfully be given in an action of covenant, even if the company had been guilty of fraud. But it by no means follows that profits are not to be allowed, understanding, as we must, the term "profits" in this instruction, as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract. Actual damages clearly include the direct and actual loss which the plaintiff sustains propter rem ipsam non habitam. And, in case of a contract like this, that loss is, among other things, the difference between the cost of doing the work and the price to be paid for it. This difference is the inducement and real consideration which causes the contractor to enter into the contract. For this he spends his time, exerts his skill, uses his capital, and assumes the risks which attend the enterprise. And, to deprive him of it, when the party has broken the contract and unlawfully put an end to the work, would be unjust. There is no rule of law which requires us to inflict this injustice. Whenever profits are spoken of as not a subject of damages, it will be found that something contingent upon future bargains or speculations or states of the market are referred to, and not the difference between the agreed price of something

contracted for and its ascertainable value or cost. See Masterton v. Mayor of Brooklyn, 7 Hill [N. Y.] 61 [42 Am. Dec. 38], and cases there referred to. We hold it to be a clear rule that the gain or profit of which the contractor was deprived by the refusal of the company to allow him to proceed with and complete the work was a proper subject of damages.' "

Measured by this rule, and applying the facts of this case, we are of opinion that the measure of damages was the difference between the cost of manufacture and the contract price, and they were in no sense speculative as ruled by the referee. Nor does the fact that the evidence shows that the claimant sold some of the burners to others, but does not show the amount obtained for them, alter the claimant's right to recover the difference between the cost and the contract price. The evidence does not show how many burners were manufactured by the claimant, either before or after the filing of the petition in bankruptcy and the consequent breach of the contract, nor how many were disposed of by the claimant nor the price therefor, but the evidence does show that the claimant after the breach was required to buy "mantels, boxes, cases, glassware, and excelsior" to complete the burners for sale and prepare them for the market, and also to furnish a market for them. None of these things was the claimant required to do under the contract with the bankrupt, and, if the trustee or the creditors wished to show these sales in mitigation of damages, they had an opportunity to do so when the case was being heard. The burden was on the objectors to show anything they wished in mitigation of damages and the opportunity was at hand when the witnesses were on the stand testifying to the damages suffered by the claimant. If the objectors chose to pass by their opportunity, they cannot now complain, and the referee erred in using this evidence to weaken claimant's proof of cost.

The only question that remains is whether the claimant is entitled to recover these damages against the bankrupt; the breach having been occasioned by the filing of the petition in bankruptcy. We are of the opinion that he is. Section 63a of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3447]) provides:

"Debts of the bankrupt may be proved and allowed against his estate which are * * * (4) founded upon an open account, or upon a contract express or implied."

The claim under consideration was founded upon an express contract in writing, the damages for the breach of which were unliquidated. The claim was therefore a provable claim, and under section 63b could be liquidated upon application to the court in such manner as it should direct. As no application was made to the court, and as there is no standing order or rule providing a method of procedure by jury trial upon issue framed or by an adjudication upon evidence before the referee or judge, and as the parties submitted themselves to the referee, who after a full hearing and careful consideration of all the evidence adjudicated the claim, which in our opinion was a most satisfactory and appropriate method for the proper liquidation of the damages, we see no reason why the claim is not to be considered as having been proved and liquidated in accordance with sections 63 a and b of the act. In Re Swift, 112 Fed. 315, 50 C. C. A. 264, in the Circuit Court of Appeals for the First Circuit, it is said:

"Under some bankruptcy statutes, provision was made for liquidating the present values of contingent debts and contingent liabilities for provable purposes. Rev. St. § 5068. But the present statute does not expressly provide any machinery for that purpose. It provides without apparent restriction for proof of debts founded on contracts, express or implied, and also, in a general way, for liquidating unliquidated claims; but, in the absence of any express provision for contingent engagements including those for property to be delivered on demand and payment of purchase money, there seems to be some difficulty in applying the statute. However, we need not go into the troublesome questions that are raised by this omission, because we have already seen that in the case at bar the proceedings in bankruptcy rendered unnecessary a demand and tender, and, like the great mass of matters affected by such proceedings, we must hold that this proof of debt relates to the time when they were commenced. From that time the stocks in question were put beyond the power of the stockbrokers to deliver effectually. The contract ripened simultaneously with the beginning of the proceedings in bankruptcy, as the consequence thereof in connection with the adjudication which followed. Of course, as everything related back to the filing of the petition, the ripening of the claim did not occur before it was filed, nor afterwards, but simultaneously with it, as already said. Consequently, by necessary effect, there was created and existed when the proceedings commenced a provable claim."

So in the case at bar upon the filing of the petition in bankruptcy and the adjudication thereon it was impossible for the bankrupt to accept a delivery of the goods and make payment for them. A breach of the contract therefore occurred upon the filing of the petition, and the claimant was relieved from making tender of the goods.

Under all the facts and the law of this case, we are satisfied that the referee erred in disallowing this claim. The report of the referee must therefore be reversed as to the claim of the Iron City Stamping Company, and the claim must be allowed, and the report of the referee affirmed as to the other findings allowing and disallowing claims.