# B. BAESSETTI v. SHENANGO FURNACE COMPANY.[1]

*July 3, 1913.*

Nos. 18,128—(211).

**Sale of timber — breach of contract — measure of damages.**

Defendant contracted to purchase from plaintiff a specified amount of "lagging," and "mining timber" at stated prices. Plaintiff had stumpage rights on certain land from which it was understood the timber was to be cut to fulfil the contract, which called for all of the timber on the land, and plaintiff had no other land from which he could cut lagging or mining

1 Reported in 142 N. W. 322.

timber. After a portion of the contract had been completed, defendant notified plaintiff that it would receive no further lagging. Plaintiff at this time had 200 cords cut and ready to deliver. He continued to cut the remaining timber on his land into lagging and mining timber and sold it all to others. It is *held:*

(1) As to the 200 cords of lagging that had been cut, but not delivered at the time of the breach of the contract, the evidence was conclusive that it had a market value at that time, and the measure of damages was the difference between the contract price and such market value.

(2) The general rule as to the measure of damages for breach by the vendee of an executory contract for the sale of personal property is that the vendor may recover the difference between the contract price and the market value. Where such property has no market value, or where the goods are to be manufactured to fill the contract, and the vendee renounces the contract before this is done, the measure of damages is the difference between the contract price and the cost to the vendor of completing the contract. Plaintiff having, after the notice of cancelation, gone on and completed the preparation of the lagging and mining timber called for by the contract, the measure of his damages is the difference between the market value thereof and the contract price, the evidence being conclusive that the property had a market value.

(3) It appearing that plaintiff had no other lagging or mining timber save that growing on this particular land, and that he actually sold such lagging and timber, he can recover as damages no greater sum than the difference between the contract price and the amounts realized from such sales, making proper allowance for the additional cost of hauling.

Action in the district court for St. Louis county to recover $1,704 for wrongfully canceling defendant's contract with plaintiff and preventing him from fulfilling it. The case was tried before Hughes, J., who at the close of the testimony denied defendant's motion for a directed verdict and a jury which returned a verdict of $673 in favor of plaintiff. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Reversed and new trial granted.

*Washburn, Bailey & Mitchell,* for appellant.
*Edward Freeman,* for respondent.

HALLAM, J.

Action to recover damages for the breach of an executory contract for the purchase by defendant from plaintiff of certain lagging and mining timber. The trial resulted in a verdict for plaintiff in the sum of $673. Defendant moved for judgment in its favor notwithstanding the verdict, or, if that was denied, for judgment in its favor except as to a certain sum, or if that was denied, for a new trial. Each of these motions was denied, and defendant appealed from the order.

The contract, for the alleged breach of which plaintiff sought damages in this action, consisted on defendant's part of a written order or request from defendant dated November 20, 1911, that plaintiff furnish defendant with 1,000 cords of 6 foot "lagging" delivered before March 15, 1912, at Shenango mine or on board cars at a siding for shipment to other mines of defendant, at the price of $3.90 per cord, and also an agreement to take from plaintiff not over 20,000 lineal feet of "mining timber" at 3 cents per lineal foot, logs to be 7 inches or more at small end, and 12 feet long, and to be delivered at Shenango mine.

Defendant operates an underground mine called the Shenango mine, and also two other mines. Plaintiff owned stumpage rights on three 40-acre tracts a mile or two distant from the Shenango mine. "Lagging" is short, rough timber used to put over the drifts in underground mines to support the overburden and protect the men working below. "Mining timber" is timber used as uprights to support the lagging.

Plaintiff had delivered 76 cords of lagging to the Shenango mine and had 200 cords more cut and piled on his land, when defendant, on December 22, 1912, canceled the contract, claiming that the lagging delivered was of a very inferior quality. One of the issues on the trial, and probably the main issue, was whether defendant was or was not justified in canceling the contract. It is conceded here that this was a question for the jury, and that the evidence was such that the verdict is final on this issue.

The questions before us on this appeal relate to the measure of

plaintiff's damages. The trial court instructed the jury that, if plaintiff was entitled to recover at all, he would be entitled to the contract price for the lagging actually delivered at the mine. This was clearly correct, and no claim is made to the contrary. As to the 200 cords which had not been delivered, but which had been cut in the woods, the court ruled that the measure of damages was the difference between the contract price and the market value, provided the jury found there was a market value for such lagging, but that, if they found there was no market value, the measure of damages would be the difference between the contract price and the cost to plaintiff of the lagging delivered according to the contract. As to the standing timber on plaintiff's land which was necessary in order to complete his contract with defendant, and which had not been cut at the time the contract was canceled, the trial court instructed that the measure of damages was the difference between the contract price and what it would have cost plaintiff to cut, haul and deliver the same in accordance with the contract, including the cost of the stumpage.

It appeared conclusively from the evidence that the land on which plaintiff had the stumpage rights contained just about enough timber to take care of the contract, and that plaintiff had no other land from which he could cut and sell lagging or mining timber. After defendant canceled the contract, plaintiff, whose stumpage rights expired that winter, continued the cutting of his timber, and cut substantially all timber on the land into lagging and mining timber, and thereafter and during that winter sold it all except 300 cords to other mines in the vicinity. He sold 350 cords of the lagging to the Clair Iron Co., at $4.00 per cord, 250 cords to the Oliver Mining Co., at $4.50 per cord, and 25 cords to a baker at $4.00 per cord. The 300 cords not sold during the winter of 1911-1912 was piled by plaintiff, and sold in the spring and early summer to the Oliver Company at $4.50 per cord. He sold the 20,000 feet of mining timber to the iron company at 3 cents per lineal foot. Thus, counting the 75 cords delivered to defendant, plaintiff disposed of all of the lagging and mining timber called for by the contract, and all that he had on the land. He testified that the cost of hauling was 50

cents more per cord than it would have been if the timber had been delivered to defendant under the contract.

It is apparent from the above facts that, owing to his successful efforts to dispose of to others the lagging and mining timber defendant contracted to take, plaintiff's actual loss was much less than the amount of the verdict rendered. The trial court ruled that the damages were fixed at the time the contract was broken, and that defendant was not entitled to any reduction in the amount because plaintiff afterwards succeeded in reducing his loss by sales to others.

The questions to be here decided may be thus stated: (1) Did the trial court give the correct rule as to the measure of damages for the 200 cords of lagging that had been cut but not delivered at the time of the breach? (2) Did it give the correct rule as to the measure of damages for the lagging and mining timber that had not been cut at the time of the breach, considering the fact that, after the breach, plaintiff cut the same? (3) What effect on the amount of damages recoverable for the breach has the subsequent sale to others of the lagging and mining timber?

1. In regard to the 200 cords of lagging that had been cut but not delivered to defendant at the time of the breach, if it had a market value, the measure of damages would be the difference between the contract price and such value. The trial court so stated in its charge, but left it to the jury to decide whether such lagging had a market value. We think the evidence was conclusive that there was a market value for 6 foot lagging at the time this contract was broken, and that it was therefore error to permit the jury to apply the measure of damages that would be proper in case such lagging had no market value. That the price varied at the different mines or that one of the chief buyers of lagging was at the time so stocked that he was not in the market, are not considerations that militate against this conclusion. It was for the jury to say what the market value was, and to estimate plaintiff's damages accordingly.

2. Should this same rule apply to the lagging and mining timber that was contained in the standing trees at the time of the breach, but which was then cut by plaintiff and made ready for sale? Where a contract for the manufacture and sale of an article is broken by the

purchaser before the article is manufactured, and the seller goes on and completes the article, what is his measure of damages? The object of all rules for estimating damages for breach of contract is to arrive at the actual loss which has been sustained. A rule that gives the seller, for the breach of an executory contract of sale by the buyer, more damages than he has actually sustained, is prima facie a wrong rule, as is any rule that mulcts the vendee in damages greater than the actual loss he has caused. The object is always to apply a rule that will, as nearly as possible, put the vendor in the same position as if the contract had not been broken.

The general rule as to the measure of damages for breach by the vendee of an executory contract for the sale of personal property, is that the vendor may recover the difference between the contract price and the market value. 3 Sutherland, Damages, 430. This rule is subject to modification where the property has no market value. Where the goods are to be manufactured to fill the contract, and the vendee renounces the contract before this is done, then the measure of damages is the difference between the contract price and the cost to the vendor of completing the contract. Morrison v. Lovejoy, 6 Minn. 224 (319); Glaspie v. Glassow, 28 Minn. 158, 9 N. W. 669; Mississippi & R. R. Boom Co. v. Prince, 34 Minn. 71, 24 N. W. 344; Ennis v. Buckeye Pub. Co. 44 Minn. 105, 46 N. W. 314; Silberstein v. Duluth News-Tribune Co. 68 Minn. 430, 71 N. W. 622; 35 Cyc. 594; Hinckley v. Pittsburgh B. S. Co. 121 U. S. 264, 7 Sup. Ct. 875, 30 L. ed. 967; Kingman v. Western Mfg. Co. 92 Fed. 486, 34 C. C. A. 489.

Plaintiff in the case at bar was not obliged to cut and prepare the lagging and mining timber. Indeed he had no right to do so in order to increase the damages. But we think that having gone on and completed the article, thereby lessening his damages, the amount of his recovery should be measured by the market value and not the cost of completing his contract. 2 Sedgwick, Damages (9th ed.) § 752; Hemingway Mnfg. v. Council Bluffs C. Co. 62 Fed. 897. There seems to be a conflict of authority on this proposition, but we conceive the logical rule to be as stated. To allow the vendor to recover profits based on the difference between the contract price and the cost

of completing his contract, and to still have on hand the completed articles, which he may sell to others at their market value, may result in a recovery of damages where none have been in fact sustained, as would be the case where the completed article had a market value equal to or greater than the contract price. This is a result that ought not to be permitted.

The evidence is conclusive that the plaintiff only had for sale the timber growing on the three forties on which he had the stumpage rights, and that, notwithstanding the notice of cancelation given by defendant, he continued to cut the trees into lagging and mining timber and had it all cut and ready for sale before the time specified in the contract for delivery, and before this action was commenced. We think the evidence shows conclusively that at the time there was a market value at the mines in the vicinity for such lagging and mining timber. This is pretty well shown by the actual sales made by plaintiff as well as by other evidence. It follows that the trial court applied the wrong measure of damages.

3. We are also of the opinion that plaintiff, having actually sold the articles in question, can recover no greater sum as damages for defendant's breach of its contract to purchase them, than the difference between the contract price and the amounts realized from such sales, making proper allowance for the additional cost of hauling. The trial court applied the principle that plaintiff's damages became fixed at the time of the breach, and declined to apply the well established rule that "a party to a contract which has been broken by the other party must so conduct his affairs, after he has knowledge of the breach, as to lessen the damage he may sustain as the result of it; and to the extent that loss can thus be avoided the vendee will be relieved from liability." 3 Sutherland, Damages (3d ed.) § 648. This rule is clearly sound and has been applied by this court in a number of cases. Hewson-Herzog Supply Co. v. Minnesota Brick Co. 55 Minn. 530, 57 N. W. 129; Crowley v. Burns Boiler & Mnfg. Co. 100 Minn. 178, 110 N. W. 969. The trial court relied upon a doctrine that we think is not applicable here and upon authorities most if not all of which are distinguishable in a vital respect.

Where the vendor, for instance, is a dealer in lumber, and agrees

to sell to the vendee a specific number of feet, but still has a stock on hand from which to sell to others, if the vendee refuses to receive the lumber, the damages would not be affected by the fact that the same bill was disposed of to another purchaser. So if a contractor, who is engaged through his servants or subcontractors in building houses on contract, contracts with A to build him a house, and A breaks the contract, he may recover damages for the breach, without having charged against him the profits made on a subsequent contract with another for the same house. The reason is that the dealer might have made two sales instead of one, if the sale to the first customer had been completed, and the contractor might have built two houses instead of one if A had not broken his contract. This is clearly expressed in Olds v. Mapes, 177 Mass. 41, 58 N. E. 478, where it is said: "It does not appear, and it is not to be assumed, that the plaintiffs were not competent to carry on several contracts at one time, and the making of profits on a new contract does not appear to be because of relief from the obligations of the old one." In Cameron v. White, 74 Wis. 425, 43 N. W. 155, 5 L.R.A. 493, plaintiff contracted to sell and deliver to defendant sawed lumber, and purchased logs from which the lumber was to be sawed, but, before any of the lumber was sawed, defendant notified them that he would not fulfil the contract. Plaintiff afterwards sawed the logs and sold the lumber to others. It was held, in accordance with previous Wisconsin decisions, that as plaintiffs could not enhance the damages against the defendant by their neglect to make the best of what they had on their hands, they are not bound to lessen the damages by making other contracts and performing them, and giving the benefit of the performance of such contracts to the defendant.

To the same effect is Allen v. Murray, 87 Wis. 41, 57 N. W. 979, though in this case the court recognizes what we conceive to be the real basis upon which the rule stands. Pinney, J., said: "The exclusion of evidence to show what the plaintiffs made under a second logging contract, made with Carmichael, during the same logging season, after the breach of the contract with the defendant, offered in reduction of damages, was correct. The contract was not one for personal services, and *non constat* but that the plaintiffs might have obtained means and resources with which to put in these logs for

Carmichael, as well as to have performed their contract with the defendant." There are other cases which apply the same rule, and some perhaps that apply it with the result of giving more damages for the breach by the vendee of an executory contract than the vendor actually sustains. But, as said by Mr. Justice Elliott in Crowley v. Burns Boiler & Mnfg. Co. supra: "If the application of a particular rule for measuring damages to given facts results in more than compensation, it is at once apparent that the wrong rule has been adopted."

In the case at bar plaintiff had a particular lot of timber and no more. It is as if plaintiff had owned a particular horse or a particular forty of land, and defendant had canceled a contract to purchase at an agreed price. Can it be doubted that, if plaintiff immediately sells his horse or his land to another purchaser, he has suffered no damage beyond the difference between the contract price and the price received, if that happens to be more than the market value? We think that plaintiff, having cut the timber and sold it, cannot have both his profit on such sales and the profits he would have made had the sale to defendant been consummated.

We are not of the opinion that judgment should be here ordered for any specific sum. It is a case for a new trial, on which, if the evidence is practically unchanged, the rules for measuring plaintiff's damages as we have stated them in this opinion should be applied.

Order reversed and new trial granted.