(No. 2794—

MOORE BROS. CONSTRUCTION COMPANY, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 26, 1939.*

KRAMER, CAMPBELL, COSTELLO & WIECHERT, for claimant.

JOHN E. CASSIDY, Attorney General; MURRAY F. MILNE, Assistant Attorney General, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

This claim arises out of the construction of a part of S. B. I. Route 177, Section 109, which extends from the Junction with S. B. I. 15 in Okawville easterly seven and one-half (7½) miles to Station 449 in Washington County. From Station 449 Route 177 continued east through New Minden where it intersects Route 153.

The original survey for Route 177 was made by the Division of Highways in 1926. Two routes out of Okawville were indicated on the survey maps, a so-called east route and a north route. The Chief Highway Engineer indicated his opinion that the north route was the most feasible. Individuals interested in these two routes procured deeds for the respective rights-of-way for as much property as they could

obtain. Deeds for the north route were never delivered to the Divisions, but such deeds were procured in an effort to induce the Division to select the respective routes.

On March 24, 1931 the Director of the Department of Public Works and Buildings and the Chief Highway Engineer entered an order officially locating the road over the east route. This road began at Station 28+00 in Okawville, went due east about three miles, then northeast about four miles to Station 120, from which point the road extended eastward to Station 449. Necessary right-of-way for this route was partly obtained by voluntary conveyances, and in February, 1932 the Department caused suit to be filed in the County Court of Washington County to condemn the right-of-way for the east route over such required lands as had not been deeded. July 1, 1932 the County Court entered judgment authorizing construction over the east route and awarded damages in excess of $2,500.00, which together with court costs and other expenses was raised by the people of the community, in a total sum of over $3,500.00.

On September 30, 1932 the Department awarded a contract to George B. Richardson of Decatur for the construction of the Plum Creek Bridge just east of Okawville on said route; also a contract to claimant for construction of culverts, grading, concrete pavement, etc., for such east route and extending eastward from Station 120, at a total project cost of $128,329.60.

October 13, 1932 claimant began construction operations. October 20, 1932 a contract for the project was executed by the claimant and the Department of Public Works and Buildings. This contract provided that claimant would complete the project on or before June 15, 1933. Claimant sub-contracted all grading operations to A. L. Brady, and the sub-contractor moved in his equipment and began operations November 7th. Richardson began operations on the Plum Creek Bridge on January 11, 1933, using a crane owned by claimant. Prior to January 17, 1933 claimant ordered cement from various companies and on the latter date cancelled the order for the unshipped balance of 23,978 barrels with the Alpha Portland Cement Company, and was authorized to order same from the Marquette Cement Manufacturing Company.

Meanwhile, citizens of the community who were interested in the north route continued their efforts for a relocation over the so-called north route. This portion would extend north out of Okawville from Station 28+00, and would then turn east for a distance of several miles until it reached Station 120, where the two disputed routes would intersect. January 18, 1933 the Highway Division ordered claimant to cease operations, and on the following day rescinded this order. The Attorney General rendered an Opinion to the Department under dates of January 25th, April 7th, and May 31, 1933; that the Department did not have power to change the location and could not acquire the right-of-way over the north route by eminent domain because it had already exhausted such power by locating the road and acquiring the right-of-way over the east route. On February 24, 1933 claimant was notified by the Department through its District Engineer that no work was to be done on that portion of the contract west of Station 120, but that there were no restrictions in regard to the balance of the work. This restriction affected only the short disputed sections involved in the two proposed routes.

Article 3.2 of the Standard Specifications for Road & Bridge Construction, which was a part of the contract in question, provides that a Progress Schedule shall be filed by the contractor when requested. Under such schedule as submitted by claimant he agreed to finish the paving at Station 10+09, being a short section of pavement in Okawville just beyond the west terminal of the two disputed routes, by June 1, 1933. This date must be borne in mind when considering any change in plans, expense or any inconvenience which was caused by reason of the non-construction by claimant of the disputed section of paving. Claimant R. J. Moore testified that of the equipment that was on the job west of Station 120 none was used on any other work until after it was released on July 10, 1933; that the culvert equipment was idle until July 10th and that the other equipment was idle up to April 15, 1933.

The controversy over the north and south routes was taken by appeal to the Supreme Court and on February 21, 1935 an Opinion was filed by the latter, the case being entitled *"The Department of Public Works & Buildings* vs. *Adolph*

*L. Schlich,* 359 Ill. 337," wherein the court held that the Department had no authority to change the route, and the judgment of the Circuit Court of Washington County was reversed. On September 6, 1933 respondent, through the Division of Highways, notified claimant in writing that due to right-of-way difficulties it was understood that claimant would be unable to complete its paving on the portion of the work then in dispute, and that claimant was under no obligation to keep its equipment on this section after it had completed the work within the limits on which the right-of-way was settled. Claimant offered in 1935 to complete the work at an increased cost estimate, and on July 16, 1935 they were informed that if they proceeded with the work, it would have to be in accordance with the plans and at the unit prices stated in the contract. By agreement a cancellation of that portion of the contract pertaining to the section of road in dispute was effected, and claimant was released from performing such work, the release being without penalty and with the understanding that the contractors may proceed to secure judgment through the Court of Claims for any losses previously incurred, it being understood that claimant reserves all rights to file and prosecute a claim against the State for damages sustained, by reason of the failure by the State to secure the right-of-way, and for any other damages incident thereto. Conferences were had between the representatives of the Highway Department and claimant in an effort to arrive at what damages claimant may have suffered. The figures arrived at by the Highway Department, based upon rental value of equipment for the period of delay from June 19th to September 6th and for time allowance for A. P. Moore, General Superintendent, J. G. Moore, Foreman, and R. Stephen, Time-keeper, and workmen's compensation insurance amounts to a total of $9,467.51. This was later corrected to $9,011.33. Sub-contractor Brady's damages were estimated at $7,125.38. Claimant contends that its actual damages for itself and Brady by reason of extra cost for superintendents, rentals, etc., amounted to $13,483.27 and of the Sub-contractor Brady for whom it acts, of an additional sum of $11,176.35. Claimant contends that although Brady did not have a contract with the State, he had a sub-contract with the claimant with the permission of the State, and that

the same rules which apply to claimant's damage would apply to Brady's. Claimant contends that the aggregate of the two sums is owing to the claimant and it is liable to Brady for the amount of Brady's damage. The rental values as considered by the Highway Department were under cost of ownership schedules of the Associated General Contractors of America and are figured upon depreciation, overhauling, major repairs, painting, interest, taxes, storage and insurance. The rates shown in claimant's Exhibits C, D and E are based upon the experience of contractors operating throughout the United States and engaged in many types of construction, including only in part highway construction. The record shows that a roadster for which credit was taken in claimant's figures was available to claimant at all times for private use; that the Boss mixer and certain other equipment were peculiar in use for culvert and small bridge construction and are not to be confused with paving operations; that the trucks and Ford flat body were available for other paving work.

As the apparent decrease or shortening of the proposed pavement under the contract in question amounted to only 14.4 per cent of the total contract price, it would appear from the foregoing that the respondent had a right to cancel and leave out entirely the disputed section of highway, and that no allowance would be made to the contractor for any change in his anticipated profit under the contract. No contention to this effect has been made by the Attorney General however, and the only issue before the court is the proper measure of damages upon which to base claimant's recovery, and the amount of the award to which he should, under the facts, be entitled.

Claimant contends that the least amount to which it should be entitled is the amount of damage estimated by the Highway Department in a conference between it and the representatives of the Highway Department. Respondent contends that the contractor had a right to either of two courses; to have finished the contract in full and then to have sued for the damage due to its being delayed; or, to decline as it did to complete its contract and to thereupon claim damages for what its profit would have been on the remainder of the work had it been permitted to have performed same in due time

and without interruption by matters chargeable to respondent.

The change in the length of pavement resulted in a reduction in the total contract amounting to $22,930.53 or 14.4 per cent of the total contract price.

Article 4.3 of the Standard Specifications for Road and Bridge Construction which were a part of the contract in question provides:

"The Department reserves the right to alter the quantities of work to be performed or to extend or shorten the improvement, provided the total price for all such alterations, extensions, or deductions does not exceed twenty-five (25) per cent of the original contract price, or contract price corrected as provided in Article 2.2. Should any of the changes provided herein be made, the contractor shall perform the work as altered, increased, or decreased at the contract price. No allowance will be made for any change in anticipated profits nor shall such changes be considered as waiving or invalidating any condition or provision of the contract."

It does not appear that the right of the Department to alter, extend or decrease the proposed improvement must depend upon any certain grounds, but that the Department reserves the right to alter the contract for any cause so long as the alteration or deduction does not exceed 25 per cent of the original contract price; further, that no allowance will be made for any change in such case for anticipated profits. That portion which was cancelled from the contract of claimant was afterwards awarded to another contractor and constructed by him.

No substantial delay to claimant was caused by respondent as to any of its work under the contract except as to the disputed section. There was apparently however some delay because of other matters not chargeable to respondent, for claimant did not finish its paving operation at Station 120 until August 31st. It began paving at Station 28 September 2nd and finished the stretch of pavement in Okawville at Station 10+09 on September 5, 1933. On September 6, 1933 the Engineer in charge advised claimant that he was under no obligation to keep his equipment, particularly his paving outfit, on the section, if all the work within the limits on which the right-of-way was cleared, had been completed. Claimant agreed to a cancellation as to the balance of his contract and the court is of the opinion that the proper measure of damage sustained by it for the loss incident to such cancellation is the profit which claimant would have made had it been able

to have proceeded with the construction of the remaining 14.4 per cent of the work for which it had contracted. Counsel for claimant in his Reply Brief (p. 12) concedes that, "If claimant had immediately quit work on February 24, 1933 and moved its equipment, that loss of profit would have been the basis of damages, but that it kept its equipment, maintained its overhead and did all the things which it did until July 12, 1933 and was then relieved of its contract and was told it could move its equipment and use it elsewhere (on other state contract work) which it did, stopping the damages."

The fact remains that claimant elected not to complete its contract and under the rule laid down in the case of *Guerini Stone Co.* vs. *Carlin*, 240 U. S. 264, we believe the proper measure of damages is the loss of profits incurred. In that case the court said:

"There was testimony as to the profits that plaintiff probably would have gained if the contract had been proceeded with in the ordinary manner. But this question was excluded from the consideration of the jury upon the ground that the profits were contingent and speculative. In this there was error. The testimony was from an experienced witness, and included an estimate of the total cost to plaintiff of the doing of the work called for in sub-contract. This amounted to $53,012.00. The contract price was $64,750.00. The witness testified that a profit of $9,700.00 would have been made. Whether he intended to say $11,700.00 was for the jury to determine. No more definite or certain method of estimating the profits could well be adopted, than to deduct from the contract price the probable cost of furnishing the materials and doing the work. *Phila., Wil. & Balt. R. R.* vs. *Howard*, 13 How. 307, 344; *Hinckley* vs. *Pittsburgh Steel Co*, 121 U. S. 264."

Claimant cites the case of *Underground Construction Co.* vs. *San Dist.*, 367 Ill. 360, wherein claimant had a contract for construction work to be paid for in monthly installments. The installments not being paid when due, claimant discontinued the work until payments were made, whereupon it resumed and completed its work. A supplemental contract was made at the time the work was resumed, extending the time for completion, waiving penalty clauses against the contractor incident to the time limits, and further reciting that plaintiff claimed special damages by reason of such delay, for which defendant denied any right to recovery. After the completion of the work and settlement of the contract price, plaintiff sued the defendant for special damages resulting from the delay. The court held that damages for delay of work caused by failure to pay installments when due were

within the contemplation of the parties as expressed in the contract, and that such delay in payment constituted ground for special damages. The court found however that the measure of such damages was provided for and limited by specific recitals in the contract, being restricted to wages of necessary watchmen and extra premium on bond, and the court reversed the judgment of the Appellate Court which had affirmed a judgment of the Superior Court of Cook County of $60,866.58.

This case does not, as we read it, meet the contention raised by the Attorney General that the measure of damages in the instant case, wherein plaintiff saw fit to take a reduction in its contract and to abandon the construction of 14.4 per cent thereof because of the delay of respondent in furnishing right-of-way, should be the amount of profit which he would otherwise have made had he completed the contract in full.

Neither this case nor the others cited by claimant negative the rule that where contractor fails to complete his contract through the fault of the other party, the proper measure of damage would be his proportionate profit on the balance of the work in question.

The portion of the contract price which would have been paid claimant had it performed its entire contract, amounted to $22,930.53. The record discloses that claimant's profit on the entire contract as originally awarded, was estimated at 17% to 18%. In addition to the percentage of profit on the entire job, the evidence for the claimant shows that it lost an additional profit of $1,892.70 which it would have made by reason of the short haul on that portion of the project which it did not complete. Claimant's profit on that portion of the contract which it rightfully abandoned because of respondent's breach would therefore be 17% of $22,930.53 plus $1,892.70, to wit, a total of Fifty-seven Hundred Ninety Dollars and Eighty-nine Cents ($5,790.89).

A part of the work for which claimant would have been paid the sum of $22,930.53 would apparently have been done by the sub-contractor Brady, but there is nothing in the record which would form a basis upon which the court could apportion this sum or the profit therefrom between claimant and Brady. As conceded by claimant in its reply brief, the aggregate of the damages sustained by the two is owing to the

claimant, and its liability to Brady is a matter between themselves.

Award is therefore hereby entered in favor of the claimant in the sum of Fifty-seven Hundred Ninety Dollars and Eighty-nine Cents ($5,790.89).