## HINCKLEY v. PITTSBURGH BESSEMER STEEL COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Argued April 5, 1877. — Decided April 18, 1887.

The defendant agreed, in writing, to purchase from the plaintiff rails to be rolled by the latter, "and to be drilled as may be directed," and to pay for them $58 per ton. He refused to give directions for drilling, and, at his request, the plaintiff delayed rolling any of the rails until after the time prescribed for their delivery, and then the defendant advised the plaintiff that he should decline to take any rails under the contract: Held,

Statement of Facts.

(1) The defendant was liable in damages for the breach of the contract;
(2) ... plaintiff was not bound to roll the rails and tender them to the defendant;
(3) The proper rule of damages was the difference between the cost per ton of making and delivering the rails and the $58.
It was not improper to admit evidence which was unnecessary and which could not affect the merits of the case, or evidence from which it appears no prejudice resulted.

THIS was an action at law, brought in the Circuit Court of the United States for the Northern District of Illinois, by the Pittsburgh Bessemer Steel Company, (Limited,) a Pennsylvania corporation, against Francis E. Hinckley, to recover damages for the breach by Hinckley of a written contract for the purchase by him from the company of 6000 tons of steel rails. The contract was as follows:

" *Memorandum of Sale.*

"The Pittsburgh Bessemer Steel Company (Limited) have sold and hereby agree to make and deliver to the order of F. E. Hinckley, Esq., 204 Dearborn St., Chicago, Ills., and the said Hinckley has purchased and agrees to pay for, six thousand gross tons of first-quality steel rails, to weigh fifty-two (52) pounds to the yard, and to be rolled true and smooth to the pattern to be furnished by the said Pittsburgh Bessemer Steel Company, (Limited,) pattern No. 5.

"Said rails are to be made of the best quality of Bessemer steel, and to be subject to inspection as made and shipped, and to be well straightened and free from flaws, and to be drilled as may be directed; at least ninety per cent. shall be in thirty (30) feet lengths, with not over ten (10) per cent. of shorter lengths, diminishing by one foot differences, none to be less than twenty-four (24) feet.

"All second-quality rails or excess of shorts which may be made, not exceeding five (5) per cent. of each month's shipments, to be taken at the usual reduction of ten (10) per cent. in price, and to be piled and shipped separately, (painted white on both ends,) as may be ordered by the inspector.

"Deliveries to begin in May, 1882, in which month one

thousand tons shall be delivered, and to continue at the rate of twenty-five hundred tons per month after July 1, 1882, until finished, strikes and accidents beyond ordinary control of said steel company, and acts of Providence preventing or suspending deliveries, alone excepted, in which case deliveries are to be delayed for a corresponding length of time only.

"Price to be fifty-eight dollars net, per ton of 2240 pounds of finished steel rails, ex. ship or f. o. b. cars at Chicago, Ills., seller's option.

"Terms of payment, cash on delivery of inspector's certificate for each five hundred tons as fast as delivered. If shipment is delayed without fault of said steel company, payment is to be made in cash upon completion and delivery of each five hundred tons at Chicago and inspector's certificate. Rails to be inspected at mill as fast as completed and ready for shipment.

"In witness whereof, the said Hinckley has hereto set his hand and seal, and the Pittsburgh Bessemer Steel Company, (Limited,) by its duly authorized officers, hath signed and affixed its corporate seal, the day and year aforesaid.

"It is further agreed, that the Pittsburgh Bessemer Steel Company (Limited) are not to be responsible for delays resulting from failure of railroads to furnish cars, proper efforts having been made to procure them, nor for detentions after shipment has been made.

"It is understood that the purchaser shall have the right to make one-half of the order fifty-six (56) pounds per yard, pattern No. 4 of said steel company, notice to be given thirty days before the time for the delivery of the rails.

"Chicago, Ills., Feb. 18, 1882.

"F. E. HINCKLEY.

"C. H. ODELL, *Broker.*"

One copy of the contract was signed by Hinckley, and a duplicate of it was signed by the company.

The defendant pleaded the general issue, and the case was tried by the court on the due waiver of a jury. The court made the following special finding of facts:

" 1. That the written agreement set out and described in the declaration was duly executed by the plaintiff and defendant in said cause, as alleged in said declaration.

" 2. That immediately after the making of said contract, and before the time to begin the execution thereof, the plaintiff purchased the requisite amount of material from which to manufacture the six thousand tons of steel rails called for by said contract, and that, after the purchase of said supplies by plaintiff, there was a decline in the value thereof, before the time for the delivery of any portion of said rails, and that lower prices for such supplies ruled during the months of May, June, July, and August, 1882.

" 3. That it appears from the parol proof heard on said trial, aside from the provision in said written contract in regard to drilling directions, that it was usual and customary for the purchaser of steel rails to give directions as to the drilling thereof, and that each railroad company has its own special rules for drilling, and the drilling of such rails is considered in the trade as a part of the work of manufacture, and a part of the duty of the manufacturer in order to fully complete the rails for use.

" 4. That, by letters dated April 3, April 20, April 26, and April 28, from plaintiff's agents to defendant, and which letters were duly received by defendant before May, 1882, defendant was requested to furnish drilling directions for the rails to be delivered in May under said contract, and defendant not only neglected to comply with such request and furnish such directions, but defendant also notified plaintiff, in reply to such request, that he, defendant, was not then prepared to receive the rails which were to be delivered under said contract in the month of May.

" Again, about the 15th of June, defendant informed plaintiff that he was becoming discouraged about being able to take the rails.

"That, about June 23, plaintiff notified defendant that it was ready to commence rolling the rails for the July deliveries, as well as to cover the thousand tons specified in the contract for delivery in May, of which plaintiff had postponed

delivery at defendant's request, and asked for drilling directions from the defendant, but defendant wholly neglected to give such drilling directions.

"That about the 26th of July, defendant, in substance informed plaintiff's agents, that his financial arrangements for money to pay for said rails, pursuant to said contract, had failed, and that he could not take said rails unless plaintiff would sell them to him on six and twelve months' credit, for which the notes of the railroad company for which defendant was acting would be given, which defendant would indorse, and also further secure with first-mortgage bonds, as collateral, at fifty cents on the dollar, but, unless he could secure the rails on such terms, he could not take them, and that plaintiff declined to accept said proposition for the purchase of said rails on credit; and I further find, that, on the 30th of August, 1882, plaintiff notified defendant that the time for the completion of his contract for the purchase of said rails had expired, and requested the defendant to advise it whether he would accept the rails or not. To this request defendant made no reply.

"I further find, that, while plaintiff did not expressly agree with defendant to postpone the time for the delivery of the rails to be made and delivered under said contract, yet plaintiff did in fact delay the rolling and delivery of the rails to be delivered in May, and that, by reason of the repeated statements of defendant that he was not ready to give drilling directions, not ready to use said rails, and not ready to accept them, plaintiff did postpone rolling said rails, and in fact never rolled any rails to be delivered on said contract, but that plaintiff was at all times during the months of May, July, and August ready and able, in all respects, to fulfil said contract and make said rails, and the same would have been ready for delivery, as called for by said contract, if defendant had furnished drilling directions, and had not stated to plaintiff's agents that he was not ready to furnish said drilling directions and not ready to accept said rails.

"I further find, that, on or about the 15th day of September, 1882, defendant was formally requested to furnish drill-

ing directions and to accept said rails, and that he replied to such request that he should decline to take any rails under said contract, and that he had made arrangements to purchase rails of others at a good deal lower price.

"I therefore find, from the testimony in this case, that defendant, by requesting plaintiff to postpone the delivery of said rails, and by notifying the plaintiff that he was not ready to accept and pay for said rails, excused the plaintiff from the actual manufacture of said rails and a tender thereof to defendant.

"And I further find, that defendant's statement to plaintiff, on the 26th of July, that he could not pay cash for said rails, as called for by the contract, and that he wished to buy them on credit, was in fact a notice that he would not be able to pay for said rails if rolled and tendered to him by plaintiff.

"I therefore conclude, and so find as a matter of fact, from the evidence in the case, that said plaintiff in apt time requested defendant to furnish directions for the drilling of said rails, and that defendant neglected and refused to do so, and that, although plaintiff was ready and able to fully perform said contract, and make and deliver said rails to defendant, as required by said contract, defendant refused to accept and pay for said rails.

"5. That plaintiff manufactured and sold to other persons 4000 tons of steel rails, from the materials so purchased with which to perform said contract with defendant, for which said rails plaintiff received $54.60 per ton, delivered at a port on Lake Huron, and that plaintiff made a profit of $1.60 per ton on said 4000 tons; that, by reason of defendant's refusal to accept said rails, the plaintiff had no employment for its mill for a time, and was obliged to stop its mill for about three weeks, in the month of August, 1882.

"6. That it would have cost plaintiff $50 per ton to have manufactured and delivered the rails called for by said contract to defendant, according to the terms of said contract; so that plaintiff's profits, if it had not been prevented from fulfilling said contract by the conduct of defendant, would have been $8.00 per ton on each ton of rails called for by said contract.

"And, because of said facts, I find that defendant was guilty of a breach of said contract, and that plaintiff hath sustained damage, by reason of such breach, in the sum of $42,400."

On these findings, a judgment was entered for the plaintiff for $42,400 damages, and for costs. 17 Fed. Rep. 584. To review that judgment the defendant brought this writ of error. After the record was filed in this court, it being discovered that there was an error in computation in entering the judgment for $42,400, instead of $41,600, the Circuit Court allowed the plaintiff to remit the difference, $800, and an order was entered accordingly, as of the date of the judgment.

*Mr. Thomas S. McClelland* for plaintiff in error.

1. The giving of drilling directions, as an option reserved to the plaintiff in error, was not a condition precedent to a performance of the contract on the part of the defendant in error; and its failure to manufacture and deliver the goods provided for by the contract was a breach which barred it from maintaining this action. *Palm* v. *Ohio & Mississippi Railroad*, 18 Ill. 217; *Christian County* v. *Overholt*, 18 Ill. 223.

2. If there is a cause of action against plaintiff in error, the measure of damages should be the difference between the contract price and the market price at the time and place of delivery, and not the difference between the contract price and the cost of manufacturing and delivering the goods, as found by the lower court. *Pollen* v. *Le Roy*, 30 N. Y. 549; *Masterton* v. *Brooklyn*, 7 Hill, 61;[1] *Boorman* v. *Nash*, 9 B. & C. 145; *Story* v. *New York & Harlem Railroad*, 6 N. Y. 85; *Maclean* v. *Dunn*, 4 Bing. 722; *Leigh* v. *Paterson*, 8 Taunt. 540; *Gainsford* v. *Carroll*, 2 B. & C. 624. The contract was one and indivisible notwithstanding the goods were to have been delivered by instalments, and if any breach of the contract occurred, occasioned by the nonfeasance of Hinckley, it was when he failed to furnish drilling directions for the May delivery of 1000 tons, and the measure of damages should

[1] *S. C.* 42 Am. Dec. 38.

have been fixed at the difference between the market and contract prices in that month. *Masterton* v. *The Mayor, &c.*, 7 Hill, 71.[1] In an action by a vendee against a vendor, for a breach in not delivering the article sold, the measure of damages is the market price at the time of the breach. *Marsh* v. *McPherson*, 105 U. S. 709; *Hopkins* v. *Lee*, 6 Wheat. 109; *Douglass* v. *McAllister*, 3 Cranch, 298; *Shepherd* v. *Hampton*, 3 Wheat. 200; *Masterton,* v. *Mayor*,[1] and cases cited. In an action against a vendee of real estate for a breach of contract to take and pay for land, the measure of damage is the difference between the contract price and the price for which the land could have been sold at the time of the breach. *Old Colony Rai'road* v. *Evans*, 6 Gray, 25;[2] *Griswold* v. *Sabin*, 51 N. H. 167. The defendant in error was bound to exercise due diligence to protect itself, and thereby inflict the least possible damages on the plaintiff in error, even if the latter was guilty of a breach of his contract. It was the duty of the former to have manufactured the raw material, which it claimed to have purchased for the rails in question, into standard 52 and 56-pound rails, and tender them at Chicago, the place of delivery, and, if not accepted, to have them sold at the current market price, which seems to have been about $55 per ton, and by so doing reduce Hinckley's liability to $3 per ton at the most. *Shannon* v. *Comstock*, 21 Wend. 456;[3] *Heckscher* v. *McCrea*, 24 Wend. 304, and cases cited; *Hamilton* v. *McPherson*, 28 N. Y. 72,[4] and cases cited.

3. The finding and judgment in this case being $800 in excess of the actual amount due, on the theory and basis of computation adopted by the court below, the case should be reversed and remanded, for the reason that the judgment being an entirety, and not made up of distinct and separate items, cannot be affirmed in part and reversed in part, but should be wholly reversed, with directions, providing this court shall not find other error in the record.

4. Where a witness testifies regarding written entries in a book, or a writing, and he produces extracts of the same, such

---

[1] *S. C.* 42 Am. Dec. 38.        [2] *S. C.* 66 Am. Dec. 394.
[3] *S. C.* 34 Am. Dec. 262.       [4] *S. C.* 84 Am. Dec. 330.

extracts cannot be admitted in evidence, nor can the witness use the extracts for the purpose of refreshing his memory. *Doe* v. *Perkins*, 3 T. R. 749; *Merrill* v. *Ithaca & Oswego Railway*, 16 Wend. 586,[1] and cases cited. And this court will look into the record to ascertain if such error was committed. *Martinton* v. *Fairbanks*, 112 U. S. 670, and cases cited.

*Mr. John N. Jewett* for defendant in error.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

On the special findings, the only question open for review is, whether the facts found are sufficient to support the judgment. There can be no question, that, on those facts, the defendant is liable in damages for a breach of the contract. It is provided in the contract, that the rails are " to be drilled as may be directed." The Circuit Court finds that it appears from the proof, aside from the provision in the written contract in regard to drilling directions, " that it was usual and customary for the purchaser of steel rails to give directions as to the drilling thereof ; " that each railroad has its own special rules for drilling; that the drilling of the rails is considered, in the trade as a part of the work of manufacture, and a part of the duty of the manufacturer, in order to fully complete the rails for use; that, by four letters written in April, 1882, by the agents of the plaintiff to the defendant, and which letters were duly received by the defendant before May, 1882, he was requested to furnish drilling directions for the 1000 tons of rails to be delivered in May, under the contract; that he neglected to comply with that request, and also notified the plaintiff that he was not then prepared to receive the rails which, by the contract, were to be delivered in May; that, in June, the plaintiff again asked for drilling directions from the defendant, in respect both to the 1000 tons, and to the 2500 tons to be delivered in July, but the defendant neglected to give such drilling directions; and that, in the latter part of July, he notified the plaintiff, in substance, that he would not

---

[1] *S. C.* 30 Am. Dec. 130.

perform the contract. The Circuit Court further finds, that, by reason of the repeated statements of the defendant that he was not ready to give drilling directions, not ready to use the rails, and not ready to accept them, the plaintiff postponed the rolling of them, and never rolled any rails to be delivered on the contract, but was at all times during May, July and August, 1882, ready and able to fulfil the contract and make the rails, and the same would have been ready for delivery as called for by the contract, if the defendant had furnished drilling directions, and had not stated to the agents of the plaintiff that he was not ready to furnish the drilling directions, and not ready to accept the rails; and that, on or about the 15th of September, 1882, he was formally requested to furnish drilling directions and to accept the rails, and replied to such request that he should decline to take any rails under the contract, and had made arrangements to purchase rails of others at a lower price. The Circuit Court also finds, that the defendant, by requesting the plaintiff to postpone the delivery of the rails, and by notifying the plaintiff that he was not ready to accept and pay for them, excused the plaintiff from actually manufacturing them and tendering them to the defendant. This conclusion is entirely warranted by the facts found, and, on those facts, the defendant must be held liable in damages. The only other question open on the findings is as to the proper rule of damages.

The Circuit Court finds, that it would have cost the plaintiff $50 per ton to have manufactured and delivered the rails called for by the contract, according to its terms; that the profits of the plaintiff, if the conduct of the defendant had not prevented it from fulfilling the contract, would have been $8 per ton on each of the 6000 tons, being $48,000; and that the plaintiff manufactured and sold to other persons 4000 tons of rails from the materials purchased by it with which to perform the contract with the defendant, and received for such rails $54.60 per ton, and made a profit of $1.60 per ton on the 4000 tons, being a profit, in all, of $6400. Deducting this $6400 from the $48,000, leaves $41,600, for which amount the judgment was finally entered.

The defendant contends that the plaintiff should have manufactured the rails and tendered them to the defendant, and, upon his refusal to accept and pay for them, should have sold them in the market at Chicago, and held the defendant responsible for the difference between what they would have brought on such sale and the contract price. But we think no such rule is applicable to this case. This was a contract for the manufacture of an article, and not for the sale of an existing article. By reason of the facts found as to the conduct and action of the defendant, the plaintiff was excused from actually manufacturing the rails, and the rule of damages applicable to the case of the refusal of a purchaser to take an existing article, is not applicable to a case like the present. The proposition, that, after the defendant had, for his own purposes, induced the plaintiff to delay the execution of the contract until after the 31st of August, 1882, and had thereafter refused to take any rails under the contract, the plaintiff should still have gone on and made the 6000 tons of rails and sold them in the market for the defendant's account, in order to determine the amount of its recovery against the defendant, can find no countenance from a court of justice.

It is found by the Circuit Court, that, immediately after the making of the contract and before the time to begin its execution, the plaintiff purchased the requisite amount of material from which to manufacture the 6000 tons of rails; that, after the purchase of such supplies, there was a decline in their value before the time arrived for the delivery of any part of the rails; and that lower prices for such supplies ruled during May, June, July and August, 1882. It is also to be inferred, from the price at which the 4000 tons of rails were sold by the plaintiff, that the market price of rails declined below the price named in the contract; and the reason assigned by the defendant, in September, 1882, for not taking any rails under the contract, was, that he had made arrangements to purchase rails of others at a lower price. Under these circumstances, the defendant is estopped from insisting that the plaintiff should have undertaken the risk and expense of actually making and selling the rails. These considerations also show that

the rule of damages adopted by the Circuit Court was the proper one. It was in accordance with the rule laid down by this court in *Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Howard,* 13 How. 307. In that case a contractor for the building of a railroad sued the company for its breach. On the question of damages this court said, p. 344 : "It must be admitted that actual damages were all that could lawfully be given in an action of covenant, even if the company had been guilty of fraud. But it by no means follows that profits are not to be allowed, understanding, as we must, the term 'profits,' in this instruction, as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract. Actual damages clearly include the direct and actual loss which the plaintiff sustains *propter rem ipsam non habitam.* And in case of a contract like this, that loss is, among other things, the difference between the cost of doing the work and the price to be paid for it. This difference is the inducement and real consideration which causes the contractor to enter into the contract. For this he expends his time, exerts his skill, uses his capital, and assumes the risks which attend the enterprise. And to deprive him of it, when the party has broken the contract and unlawfully put an end to the work, would be unjust. There is no rule of law which requires us to inflict this injustice. Wherever profits are spoken of as not a subject of damages it will be found that something contingent upon future bargains, or speculations, or states of the market, are referred to, and not the difference between the agreed price of something contracted for and its ascertainable value or cost. *See Masterton* v. *Mayor of Brooklyn,* 7 Hill, 61,[1] and cases there referred to. We hold it to be a clear rule that the gain or profit of which the contractor was deprived by the refusal of the company to allow him to proceed with and complete the work, was a proper subject of damages."

In *United States* v. *Speed,* 8 Wall. 77, where the defendant agreed to pack a specified number of hogs for the plaintiff, and made all his preparations to do so, and was ready to do so, but the defendant refused to furnish the hogs to be packed, this

---

[1] *S. C.* 42 Am. Dec. 38.

court, citing with approval *Masterton* v. *Mayor of Brooklyn*,[1] held that the measure of damages was the difference between the cost of doing the work and the price agreed to be paid for it, "making reasonable deduction for the less time engaged, and for release from the care, trouble, risk, and responsibility attending a full execution of the contract."

These views were again approved by this court in *United States* v. *Behan*, 110 U. S. 338.

In the present case, the ability of the plaintiff to fulfil the contract at all times is found as a fact by the Circuit Court, as also the fact, that, by reason of the defendant's refusal to accept the rails, the plaintiff was obliged to stop its mill for about three weeks, in August, 1882. The defendant received the benefit of all the mitigation of damages which, upon the facts found, he was entitled to claim, and the benefit of all the profits made by the plaintiff which could properly be regarded as a substitute for the profits it would have received had its contract with the defendant been carried out.

The defendant objects that, within the statement of the rule in *United States* v. *Speed*, there was no deduction made in this case for the time saved, and the care, trouble, risk, and responsibility avoided by the plaintiff by not fully executing the contract; but there are no findings of fact which raise any such question. The finding is, that it would have cost the plaintiff $50 per ton to have manufactured and delivered the rails called for by the contract, according to its terms. Under this finding, it must be held that every proper element of cost entered into the $50; and it was for the defendant to have requested findings which would authorize an increase of that sum as cost.

There is a bill of exceptions in the case, on which two questions are raised by the defendant as to the admission of testimony. The contract between the parties was negotiated by C. H. Odell, who signed it as broker, between whom and the defendant the correspondence thereafter, down to and including the 1st of May, 1882, was carried on, Odell acting for the plaintiff. He made the contract under special instructions, his authority being limited to that of a sales agent. On his exam-

---

[1] *S. C.* 42 Am. Dec. 38.

ination as a witness at the trial, he testified that all of his communications with the plaintiff in regard to the business with the defendant were in writing or by telegram. He also testified, without objection, that he kept the plaintiff fully advised of his correspondence with the defendant concerning the rails. H. P. Smith, the business manager of the plaintiff, was then called as a witness for the plaintiff, and was asked if the plaintiff was advised of the correspondence between Odell and the defendant, which had been read in evidence, and if Odell's actions were approved by the witness as manager of the plaintiff. To this the defendant objected, on the ground that the communications between Odell and the plaintiff consisted of letters and telegrams, which were the only competent evidence of the contents thereof. The court overruled the objection, and the witness stated that the company was advised of the correspondence and actions of Odell, and fully approved and ratified the same. The defendant excepted to the decision admitting the evidence. We see no objection to the admission of this evidence, independently of the fact that Odell had, without objection, testified to substantially the same thing. The defendant, in his correspondence with Odell, all of which is set forth in the bill of exceptions, treated Odell as representing the plaintiff, and cannot now be heard to question his authority to do so, or to demand further evidence of such an authority, or of the adoption by the plaintiff of what Odell was doing, saying, and asking on behalf of the plaintiff. The question asked of Smith, as to whether he, as manager of the plaintiff, approved of Odell's actions, and the answer he made, were, therefore, unnecessary, and could not affect the merits of the case.

Smith was further asked to state in detail the elements of the cost of rolling the rails in question. He produced a memorandum showing items taken from the plaintiff's books, which, added together, exhibited the cost, in August, 1882, of manufacturing one ton of such rails as those described in the contract; and, on being asked by the plaintiff's attorney to testify to those items, the court, under the defendant's objection, allowed him to read the items from the memorandum.

He further testified, under an objection and exception by the defendant, that the actual cost to the plaintiff of making and delivering the rails in Chicago would have been $48.25; that he stated the elements of such cost from a memorandum prepared by himself, the elements being taken from the books of the plaintiff; that he knew the purchase price of all material which went into the manufacture, because he purchased all of it himself; that the statement was prepared by him from his personal knowledge of the cost; that he called off the items from a pencil memorandum to the bookkeeper, who wrote them down; that he (the witness) knew the items to be correctly stated; and that the information as to the items was made up from records running through a series of four or five months, and representing an average as to the cost per ton.

The defendant contends that this evidence was inadmissible, in the absence of an opportunity for him to examine the plaintiff's books, with a view to a cross-examination of the witness as to the mode of computation adopted by him, the memorandum being, as contended, the result of the conclusions of the witness from the examination of a large number of entries in the books of the plaintiff.

It is a sufficient answer to this objection, that the cost of the rails was not taken by the court at the sum of $48.25, the sum fixed by Smith, but the bill of exceptions shows that the cost was taken at $50 a ton, from the testimony of Richard C. Hannah, another witness; so that, even if the testimony was erroneously admitted, (which it is not necessary to decide,) the defendant suffered no prejudice from its admission.

*The judgment of the Circuit Court is affirmed.*