## DAVID J. JOSEPH CO. v. UNITED STATES.
### No. 46281.

United States Court of Claims.

Feb. 7, 1949.

David G. Bress, of Washington, D. C. (Newmyer & Bress, of Washington, D. C., Howard Gould, of Cincinnati, Ohio, and Alvin L. Newmyer, Jr., of Washington, D. C., on the brief), for plaintiff.

James J. Sweeney, of Washington, D. C. and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

HOWELL, Judge.

Plaintiff, a Delaware corporation, with its principal place of business in Cincinnati, Ohio, and a branch office in Houston, Texas, for the general administration of business in the Gulf area, did on July 1, 1941, pursuant to previous invitation for bids, enter into a contract with the United States, acting through the Emergency Relief Branch of the Procurement Division of the Treasury Department, for the sale to the United States of 60,000 gross tons of scrap iron of various grades and tonnages at the total contract price of $957,000. Thereafter, on August 15, 1941, an amendment to said contract was entered into by the terms of which plaintiff agreed to sell to the United States an additional 20,000 gross tons of scrap iron of various grades and tonnages as therein provided, at an additional price of $327,000. The total contract price became, therefore, $1,284,000, and the total tonnage involved 80,000 tons. Neither the contract nor its supplement authorized the United States to cancel same.

With reference to deliveries of scrap iron the contract provided as follows: "F. A. S. the following Gulf Ports at the option of the Seller and in conformity with vessel space: Tampa, Fla., Pensacola, Fla., Mobile, Ala., Gulfport, Miss., Corpus Christi, Texas, New Orleans, La., Lake Charles, La., Port Arthur, Texas, Texas City, Texas, and Houston, Texas." The expression "F. A. S." is defined as "free alongside" meaning free alongside ship.

The monthly requirements for delivery under the contract, as well as the actual

shipments of scrap iron under the contract, with dates of invoices, names of ships and quantities loaded by the plaintiff are set out in Findings 3 and 4.

As stated therein, the record discloses no complaint made to the plaintiff at any time by or on behalf of the defendant that deliveries were not maintained according to schedule. On October 3, 1941, the defendant addressed the plaintiff a letter cancelling the contract in the following language:

"The British Purchasing Commission has advised this office that they are withdrawing from the present Scrap Market and request that we cancel the undelivered balances of all scrap contracts.

"You will, therefore, make no further deliveries of Scrap, under the above numbered contract and Supplement No. 1 thereto, other than those already scheduled."

Three deliveries were shown to have been made after the date of cancellation for the reason that they had been scheduled prior thereto. Total deliveries under the contract became therefore 53,430 tons, leaving undelivered 26,570 tons.

The facts involved in this case are adequately set out in our special findings of fact and need not be again repeated for the purpose of considering the issue involved herein, which is, did the defendant's cancellation of the contract constitute a breach thereof for which the defendant is responsible to the plaintiff in damages.

In our opinion, such cancellation cannot be legally justified either by the terms of the contract or by the reasons given in the letter of cancellation set out above.

The defendant contends that the plaintiff was obliged to make advance requests of the British for ships to load its available scrap and that its failure to make such requests accounted for the reduced number of ships furnished; further, that even if ships had been furnished, plaintiff could not have performed the contract due to the shortage of scrap during the period involved and the plaintiff's heavy domestic commitments, but neither contention is supported by the evidence and they are contrary to the findings of fact.

In other words, the plaintiff was at all times ready, willing and able to perform its obligations under the contract, but was prevented from doing so by the act of cancellation on the part of the defendant.

"It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure. * * * One who agrees to pay for goods on delivery, cannot set up the lack of delivery when caused by his own act. The principle that prevention by one party excuses performance by the other, both of a condition and of a promise, may be laid down broadly for all cases. Williston on Contracts, Vol. III, Sec. 677."

Hinckley v. Pittsburgh Bessemer Steel Company, 121 U.S. 264, 7 S.Ct. 875, 878, 30 L.Ed. 967, involved a plaintiff who sold the defendant 6,000 tons of steel rails under a contract that provided that 1,000 tons were to be delivered during the first month and 2,500 tons in succeeding months until the total of 6,000 tons was met. The contract further provided that drilling directions for the manufacture of the rails would be furnished to the plaintiff by the defendant, and defendant there failed to furnish the directions. The lower court found the facts specially and entered a judgment for the plaintiff. In affirming the judgment, the Supreme Court said: "On the special findings, the only question open for review is whether the facts found are sufficient to support the judgment. There can be no question that, on those facts, the defendant is liable in damages for a breach of the contract. It is provided in the contract that the rails are "to be drilled as may be directed." * * * The circuit court further finds that by reason of the repeated statements of the defendant that he was not ready to give drilling directions, not ready to use the rails, and not ready to accept them, the plaintiff postponed the rolling of them, and never rolled any rails to be delivered on the contract, but was at all times during May, July, and August, 1882, ready and able to fulfill the contract and make the rails, and

the same would have been ready for delivery as called for by the contract, if the defendant had furnished drilling directions, and had not stated to the agents of the plaintiff that he was not ready to furnish the drilling directions, and not ready to accept the rails; and that, on or about the fifteenth of September, 1882, he was formally requested to furnish drilling directions and to accept the rails, and replied to such request that he should decline to take any rails under the contract, and had made arrangements to purchase rails of others at a lower price. The circuit court also finds that the defendant, by requesting the plaintiff to postpone the delivery of the rails, and by notifying the plaintiff that he was not ready to accept and pay for them, excused the plaintiff from actually manufacturing them and tendering them to the defendant. This conclusion is entirely warranted by the facts found, and, on those facts the defendant must be held liable in damages." Van Buren v. Digges, 11 How. 461, 13 L.Ed. 771; United States v. Peck, 102 U.S. 64, 26 L.Ed. 46.

The case of United States v. Speed, 8 Wall. 77, 19 L.Ed. 449, is analogous to the case at bar. There the plaintiffs sued in the Court of Claims on a contract in which they agreed to slaughter and pack 50,000 hogs for the Government on a fixed price basis. The contract provided that the Government was to furnish the hogs, and after it furnished 16,177 hogs and paid for their slaughter, it failed to furnish any more. In affirming the judgment for the plaintiffs in the Court of Claims, the Supreme Court said: "Without entering into a discussion of the general doctrine of the implication of mutual covenants, we deem it sufficient to say that where, as in this case, the obligation of plaintiffs requires an expenditure of a large sum in preparation to enable them to perform it and a continuous readiness to perform, the law implies a duty in the other party to do whatever is necessary for him to do to enable plaintiffs to comply with their promise or covenant."

■ There is no question that the cancellation was a total breach of contract of the defendant as to the undelivered quantity of scrap. It is settled law that an un-

qualified and positive refusal to complete performance of a contract, though the performance is not yet due, may be treated as a complete breach and entitle the injured party to bring his action at once and be compensated therefor. Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953.

■ It further appears that the defendant is now estopped from asserting that the plaintiff is guilty of a breach of contract. During the life of the contract plaintiff never received any complaint from the defendant or its agents regarding the performance and even on October 3, 1941, the date the contract was cancelled, no comment was made as to the character of plaintiff's performance up to that date, nor was such performance suggested as the reason for cancellation.

■ Defendant first asserted that plaintiff had breached the contract after this case had been docketed and it was not until after the trial began that defendant attempted for the first time to rely on this so-called breach as a basis for its cancellation. The authorities for this proposition are well summarized in Chevrolet Motor Co. v. Gladding, 4 Cir., 42 F.2d 440, 445, certiorari denied 282 U.S. 872, 51 S.Ct. 78, 75 L.Ed. 770, wherein the Court said: "When a party to a contract elects to cancel it under one or more alternative provisions conferring such a privilege, he should assign his cause and abide by it. He cannot assign one cause and cancel it, then, after being sued for wrongful cancellation, come into court and say he may have erred in respect of the cause assigned, but another cause does exist, and he is not liable. This court in Luckenbach Co. v. W. R. Grace & Co., 4 Cir., 267 F. 676, 679, said: 'But the further and equally conclusive answer is found in the settled rule of law that one who breaches his contract for reasons specified at the time will not be permitted afterwards, when sued for damages, to set up other and different defenses.' Wall Grocer Co. v. Jobbers' Overall Co., 4 Cir., 264 F. 71; McCreary v. Strongman, 3 Cir., 6 F.2d 441; Robb v. Crawford, 56 App.D.C. 394, 16 F.2d 339; Ohio & M. Railway Co. v. McCarthy, 96 U.S. 258, 24 L.Ed. 693.

"While the contract might have been terminated for various reasons before its performance was completed, the appellant eliminated these questions when it elected to cancel for the reason assigned, which the jury finds groundless."

As stated by Mr. Justice Brandeis in the case of Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434: "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."

Under these circumstances, the measure of plaintiff's damages is the amount of profit it would have earned had the contract not been cancelled. Anvil Mining Company v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814; Roehm v. Horst, supra.

The plaintiff made a net profit averaging $0.92126 per ton on the 53,430 tons that it delivered under the contract. Of the remaining 26,570 tons to be delivered, all but 3,343 tons were either in the hands of the plaintiff or under purchase orders and available for performance of the contract at the time of cancellation. The cost to the plaintiff of this tonnage was the same as that which it had delivered. The plaintiff would have averaged the same net profit on this tonnage after deducting the direct expenses for shipment if delivery had been made. There is nothing speculative or uncertain about these prospective profits and the contract price for the undelivered scrap was the same as for the delivered scrap. The direct expense incident thereto would not have been different from that used in computing profits on the delivered quantities. Plaintiff's prospective profits were obviously within the contemplation of the parties and are a mere matter of multiplication. The Office of Price Administration approved the price paid by the Government under this contract at $1.50 more per ton than plaintiff

was permitted to pay its suppliers under Maximum Price Schedule 4. The defendant therefore knew and expected that plaintiff would receive a profit of $1.50 per ton under this contract, less any direct charges borne by the plaintiff in delivering the scrap to the ships.

It plainly appears with reference to the 3,343 tons not yet purchased at the time of cancellation that plaintiff would have been able to procure and deliver them in the ordinary course of business. Therefore, the same prospective profit would have been realized on this tonnage had the contract not been cancelled. The cost of the scrap for plaintiff could not have been more than that already purchased because OPA Maximum Price Schedule No. 4 was in effect at that time, which schedule would not permit the plaintiff to buy scrap at higher prices than previously bought and delivered under this contract. Plaintiff never paid more than this regulation permitted and it is reasonable to assume that it would not have done so for this amount which it could easily and speedily have secured.

Plaintiff fulfilled its legal obligation to diminish its damages by cancelling without loss or liability purchase orders for 9,595 tons of scrap immediately upon defendant's cancellation. The remaining 13,632 tons which were on hand or on purchase order were diverted to the domestic market and a profit of $1,136.88 was realized thereon, for which credit was given.

Had plaintiff been permitted to complete its performance under this contract it would have realized a profit of $24,477.88, less the actual profit of $1,136.88, or $23,341.00, and for this plaintiff is entitled to judgment.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.