**INDUSTRIAL URANIUM COMPANY**

v.

**The UNITED STATES.**

**No. 258–60.**

United States Court of Claims.
May 12, 1967.

Nichols, J., dissented.

869

Newell W. Ellison, Washington, D. C., for plaintiff. Wilford M. Burton, George E. Bridwell, Salt Lake City, Utah, Charles A. Miller, Robert N. Sayler, and Covington & Burling, Washington, D. C., of counsel.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge:

Industrial Uranium Company is another miner suing for compensation the Atomic Energy Commission is said to have failed to pay under its domestic uranium program. See Radium Mines, Inc. v. United States, 153 F.Supp. 403, 139 Ct.Cl. 144 (1957); Gay v. United States, 356 F.2d 516, 174 Ct.Cl. 420 (1966), cert. denied, 385 U.S. 898, 87 S.Ct. 202, 17 L.Ed.2d 130. This plaintiff, unlike its predecessors, actually delivered acceptable uranium to the A.E.C. or its licensees for several years. The claim is that, from 1958 to 1962, plaintiff should have been, but was not, paid under an A.E.C. guarantee for the vanadium content of the uranium ores it mined and sold for the Commission's immediate or ultimate use. We hold that the guarantee supports part, but not all, of the

claim, and that plaintiff should recover, but not to the full extent it demands.

Uranium is, of course, used by the A.E.C. in making atomic weapons, as well as civilian uses of atomic power. Originally the Manhattan Engineering District (forerunner of A.E.C.) acquired the ore chiefly by import. With the creation of the Commission by the Atomic Energy Act of 1946, 60 Stat. 755, and the breakdown of the efforts after World War II to control nuclear weapons by international agreement, the A.E.C. turned its attention in 1948 to developing domestic uranium sources. See Gay v. United States, supra, 356 F.2d at 517–519, 174 Ct.Cl. at 422–426. Section 5(b) (5) of the Act authorized it to "establish guaranteed prices for all source materials delivered to it within a specified time." The Commission wanted to buy uranium concentrate—derived from the milling or processing of uraniferous materials—but in the earlier stages of the program felt it necessary to purchase uranium-bearing ores and process the concentrate itself. To accomplish this it acquired a surplus government-owned vanadium mill near Monticello, Utah, and adapted it for recovery of uranium from the ores of the surrounding area in the Colorado Plateau, commonly known as the carnotite- and roscoelite-type. These ores had previously been mined for vanadium but were known to contain uranium which had generally found its way into the tailings as an unwanted by-product. The A.E.C. made a minimum of alterations in the plant and produced both uranium and vanadium in it. Later, the Commission opened other ore-buying stations and also licensed and utilized private mills to receive and process the ores, selling the concentrate to the Government. These private mills were put under contract by the A.E.C. to receive, in general, such production as they could conveniently handle. At least up to 1957, "[i]t is no exaggeration to say that in this period of uranium 'fever' * * * it was wide-ly assumed that the government stood ready to buy all the uranium anyone could find." Gay v. United States, supra, 356 F.2d at 519, 174 Ct.Cl. at 426. Though this assumption was incorrect, it did reflect the well-publicized zeal with which the A.E.C. was encouraging the private exploration and development of uranium ores.

As one of the elements in this on-going program, A.E.C. published, early in 1949, Circular No. 5 guaranteeing a minimum price for uranium-bearing carnotite-type or roscoelite-type ores of the Colorado Plateau area.[1] Originally for a limited period, this guarantee was continued and extended to March 31, 1962, with various changes which are not now relevant. The most important aspect, for present purposes, was that the established price was to be measured not only by the uranium content of the ore but also by its vanadium content (up to a stated maximum), regardless of whether the vanadium could be utilized by the Government or would have to be discarded. This inclusion in the guaranteed price of the vanadium factor remained in the circular until March 31, 1962, and was never removed or amended. Our case revolves around that commitment to pay for the vanadium in the ores.

Some five or six years after the promulgation of Circular No. 5, plaintiff was organized as a Utah corporation in 1955 to engage in uranium mining. It acquired mineral rights, and discovered claims, on the Navajo Indian Reservation, starting to mine in November 1955. About six months later it made its first sale to the A.E.C. at Monticello. From that date (April 1956) to March 1957, the Monticello station bought large amounts of ore from the company, under two successive contracts, paying Circular No. 5 prices (including the vanadium component). The Commission then told plaintiff that Monticello would no longer buy its ores but that it should deal with the Texas-Zinc Minerals Corporation

---

1. The immediate predecessor of Circular No. 5 was Circular No. 3, promulgated in the spring of 1948. Circular No. 3 also contained a guarantee for carnotite- or roscoelite-type ores.

which was opening an ore-buying station and plant, under an A.E.C. license and contract, at a spot closer to plaintiff's mines. Texas-Zinc was one of several such privately-operated mills which, by agreement with the Commission, was to acquire ore at guaranteed prices, process it, and then sell uranium concentrate to the Government at a price which would cover the mill's cost of the ore. As Monticello had previously done, Texas-Zinc paid plaintiff Circular No. 5 prices, including the specified payment for vanadium values. The plaintiff also sold some ore to other licensed private mills, likewise receiving full payment.

Late in 1957, however, the A.E.C. decided—apparently in order to reduce the cost of the uranium acquisition program —to begin eliminating the vanadium payment for ores sold to some of the private mills. Between 1957 and 1961 the agency amended most (but not all) of its agreements with these mills to cut out the vanadium factor in the price paid by A.E.C. for the processed uranium concentrate, and also to remove the mills' obligation to pay the producers for the vanadium content of their ores. This change in the arrangement between A.E.C. and Texas-Zinc took effect in July 1958, and the latter then ceased paying plaintiff for the vanadium. Another private mill with which plaintiff dealt from time to time (Rare Metals Corporation) made the change in April 1958. At Monticello, however, the Commission continued to pay full Circular No. 5 prices (until the expiration of this part of the program on March 31, 1962) to those suppliers whose ore was accepted there.

When the private mills refused to pay for its vanadium, Industrial Uranium Company made efforts to obtain the vanadium payment in other ways. It tendered its ores to Monticello, but these were refused by the A.E.C. It proposed to build a mill which could recover the vanadium and sell it, but the A.E.C. re-fused to countenance this idea. Plaintiff sought approval from the A.E.C. to be allowed to deliver parts of its ore to a mill (other than those to which it had been selling) which offered to pay the full Circular No. 5 price, but the Commission refused permission. Plaintiff was forced, if it wished to sell its ore,[2] to accept the ex vanadium price offered by Texas-Zinc and Rare Metals, the private mills with which it had been dealing. For redress it has brought this action against the United States, relying squarely on Circular No. 5. There is no claim of entitlement against the Government outside of the circular.

In our prior decisions, we have indicated that official regulations like this circular, forming part of the A.E.C.'s domestic uranium program, were definitive offers by the Commission, not simply invitations to miners to make offers to the Government. Radium Mines, Inc. v. United States, supra, 153 F.Supp. at 405–406, 139 Ct.Cl. at 147–148; Gay v. United States, supra, 356 F.2d at 523– 525, 174 Ct.Cl. at 432–433, 435. See, also, Himfar v. United States, 355 F.2d 606, 174 Ct.Cl. 209 (1966) (manganese-buying program of the General Services Administration). To the extent, therefore, that plaintiff accepted the Commission's offer, as announced in Circular No. 5, it was entitled to be paid according to that regulation's provisions. The defense is that these sales were not made under the circular at all, but under a series of special bilateral contracts which excluded the vanadium component, and in any event that the sales could not come under the circular because they fell beyond its limits in several respects. It will be easier to start with the various phases of the latter argument.

The Government urges that the circular was wholly inapplicable because plaintiff's ore was not carnotite-type. The trial commissioner has found otherwise, and we accept his determination. It may be, as defendant says, that the

---

2. Under Section 5(b) (2) of the Atomic Energy Act, sales had to be made to Commission licensees. 60 Stat. 761.

ore plaintiff mined was not carnotite mineral in a scientific or geologic sense but we are satisfied that the trial commissioner was right when he said that "the framers of Circular 5 did not intend to describe the mineralogical make-up of the ore thereby, but rather, the description related to the type of ores that historically had been mined from the Colorado Plateau, as the terms were known and understood by the miners and prospectors in that area. The miners and prospectors, in turn, believed that Circular 5 carnotite-type ores were the ores of the Colorado Plateau which contained vanadium and uranium."

■ Because the circular guaranteed minimum prices "for the delivery of such ores to the Commission at Monticello, Utah", defendant also contends that the sales for which plaintiff sues were not covered; all were made to private mills such as Texas-Zinc and Rare Metals, and none at Monticello. A sufficient answer (though perhaps not the only one) is that the A.E.C. compelled the plaintiff to go to Texas-Zinc and the other private buyers. As we have noted, at the end of February 1957, Monticello declined to accept any more of plaintiff's ore, and in 1958 after the mills (under pressure from the A.E.C.) would no longer pay for the vanadium factor, Monticello refused the plaintiff's attempts to resume delivery of its ore there, or to find some equivalent way to obtain the full Circular No. 5 price. The defendant, which thus prevented performance of the alleged condition, cannot now stand on it as a bar to recovery. 3A Corbin, Contracts § 767 (1960); 5 Williston, Contracts, § 677 (3d ed. 1961); David J. Joseph Co. v. United States, 82 F.Supp. 345, 350, 113 Ct.Cl. 3, 11 (1949).

■■ Another of defendant's points is that Circular No. 5 made no guarantee with respect to deliveries of more than a thousand tons a year, and plaintiff's sales always exceeded that limit. To us, however, the words, structure, and objectives of the regulation indicate that it was intended to govern all otherwise eligible ore, regardless of the amount. Paragraph (d) provided:

To aid small producers, any one seller may deliver without a written contract but otherwise in accordance with this circular up to, but not exceeding, 1,000 short tons (2,000 pounds per ton) of ores during any calendar year.

There then followed paragraph (e):

Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year will be required to enter into a contract with the Commission providing for, among other things, a rate of delivery and the total quantity of ore to be delivered.

As we read these sections, they did not permit the A.E.C. to vary either the price or the conditions of eligibility for the larger shipments. Paragraph (e) merely provided that, for the convenience of the purchaser and the orderly carrying-on of processing, shipments in excess of 1,000 tons would be made under advance written arrangements as to time, rate, and amount of delivery. While the circular remained unamended and in effect, the Commission could not reduce the price or flatly refuse to accept otherwise eligible ore; it did, though, have reasonable discretion as to the times and conditions of delivery. This seems to have been the contemporaneous understanding of the significant A.E.C. officials;[3] as far as we can gather, it

---

3. In 1958 the head of the domestic uranium program wrote publicly in an engineering and mining journal that the aim of the 1,000 ton provision "was not for the purpose of restricting ore production but to provide for orderly delivery schedules and planned production rates", and in the same article he answered a suggestion that the A.E.C. might limit ore purchases to the 1,000 ton non-contract commitment by saying: "This would be evasion, under a technicality, of the Commission's assurances to the miners." Three years earlier, the same official told the Joint Committee on Atomic Energy that the Commission was providing a market for all the uranium ore that it could buy "and we have a commitment to do that until March 31, 1962." The head of A.E. C.'s Grand Junction, Colorado, office tes-

was plaintiff's understanding;[4] it is supported by the omission from Circular No. 5 of the provision in its predecessor (Circular No. 3) which expressly declared that the A.E.C. was not obligated to, but could if it wished, purchase more than 5,000 tons from any one seller during one year; and it is nourished by the principle that the Government should be primarily responsible, when it draws the language, for making its meaning clear (WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963)).

Under defendant's current interpretation, moreover, plaintiff's guaranteed sales would have been less than $25,000 per year, and the A.E.C. would have been required to purchase only about three to five percent of all the uranium ore produced in the country (i. e mainly that mined by the great number of very small producers).[5] None of the medium or larger purchasers would have had any significant guarantee at all. Such a severe limitation does not accord with the Commission's aim of furthering, through this program, the large-scale exploration, development, and mining of uranium ores. To be worth anything, the guarantee would have to be far broader than that. Defendant boggles at what it now conceives to be the unlimited potential liability this reading would entail, but the A.E.C. could esti-mate the costs; and it could, as it did, restrict the guarantee to a definite time period, and stated types and qualities of ore. We judge that, aside from the refusal to pay for vanadium, the sums actually paid by the A.E.C. were about what they would have been if the circular had said in unmistakable words that the Commission or its licensees would accept any amount of ore (subject to agreement as to rate and times of delivery).

Likewise, without merit is the technical claim that plaintiff's deliveries failed the requirement that the ore had to be amenable to the processes at Monticello. Even if that standard applied to ore sold to private mills at defendant's insistence, there is no reason to believe that plaintiff's ore fell short; it was clearly amenable to the private mills' processes and the clear inference from the record is that it was also amenable to the Monticello processes or could easily be made so. If in some respects it was better than the minimum standards for Monticello, that would surely not exclude it.

On two other points, however, defendant has weightier support in the wording of Circular No. 5. These relate to the lime content of the ore. The circular provided that ore would "not be accepted by buyer under this circular

---

tified in this case that the purpose of having contracts for deliveries of more than 1,000 tons related to rate of delivery, quality, acceptability and such matters, and that the Commission never considered limiting plaintiff's shipments to 1,000 tons. No statement by an A.E.C. source, looking the other way, has been called to our attention, and the mass of statements and releases to which we have been referred is entirely consistent with the position that the ore covered by Circular No. 5 was not restricted to 1,000 tons per year.

4. The trial commissioner has found, and we adopt the finding, that at all times plaintiff thought that if it could not obtain the Circular No. 5 guaranteed price from the ore-buying stations with which it dealt (e.g., Texas-Zinc) it had an unqualified right to deliver directly to and receive payment directly from the A.E.C.

Defendant points out that the A.E.C., in the two years preceding the present dispute, often declined to take at Monticello as much ore as plaintiff was willing to tender at a particular time, and that plaintiff agreed to the lesser amounts without protest. This, it is said, shows that plaintiff understood that the amounts were wholly within the A.E.C.'s unlimited choice. But we infer, rather, that this cutting-down represented Monticello's reasonable exercise of its discretion as to the time and rate of particular deliveries (to accommodate its facilities) and that the selling company so understood.

5. Actually, the A.E.C. acquired only some 70,000 tons of ore without contract under the entire domestic uranium program.

which in buyer's judgment * * * (2) contain more than three parts of lime ($CaCO_3$) to one part of $V_2O_5$ [vanadium] or a total of more than 6% lime in the ore." Admittedly, a good part, though by no means all, of the deliveries now involved did not meet either the 3 to 1 lime test or the 6% lime test, or both. These deviations from the circular's explicit terms plaintiff explains in two different ways. We can accept one excuse but not the other.

■ As for the 3 to 1 lime test, the evidence demonstrates that the Commission, from the inception of the program, regularly accepted and paid for ore which failed to meet that requirement; so far as this record shows, the A.E.C. never rejected ore from any producer on that ground, never required its rejection by the mills, and never indicated any intention to enforce the criterion. In our view, the plaintiff has affirmatively proved that the 3 to 1 test "was a dead letter from the outset" and was effectively waived by the Commission as a condition of Circular No. 5 eligibility. See 3A Corbin, Contracts §§ 752, 755 (1960); Harvey Radio Labs., Inc. v. United States, 115 F.Supp. 444, 448–449, 126 Ct.Cl. 383, 391–392 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954). Inability to comply with this particular standard would not bar ore from the circular's coverage.

The justification given for disregarding the 6% requirement is that the A.E.C. expressly allowed the mills to buy ore containing lime over 6%, provided that the seller agreed to specified monetary penalties; plaintiff regularly paid these penalties for such of its ores as failed the test. This amounted, the argument is, to an acceptance by A.E.C. of the penalty in lieu of the 6% requirement, and thus to a waiver of this lime specification of Circular No. 5. The difficulty is that the circular, from the very beginning, made it clear that non-specification ore (e. g. containing more

than 6% lime) would never be purchased under the circular but under separate and independent arrangements. The regulation specifically provided that "Commitments by the Commission to accept delivery of ores are limited to the provisions of this [circular] * * * as amended from time to time, or to written contracts * * * ", and that Commission employees had no authority to go beyond the circular (except by special contract). The 6% lime specification was never waived and, accordingly, higher lime ores remained outside of the commitments given by the circular.

Even more significant is the note carried at the end of the circular through all its amendments and revisions:

Note: The Commission will be interested in discussing arrangements for delivery to it of types of uranium-bearing materials other than those for which guaranteed prices have been established, such as tailings, mill products, and ores of types not acceptable under [the circular].

This stated clearly that deals for non-specification ore were not subject to the guaranteed prices or to the terms of the circular, but were to be at such prices and on such terms as the particular agreements called for. To the extent they dealt with high lime ores, plaintiff's contracts (with their penalty provisions) came under this "Note" and were therefore separate from, and independent of, the circular and its guarantee. Consistently with this position, A.E.C. announced as early as July 1949 that higher lime ores were ineligible under the circular and would be bought only under special contract; thereafter the agency's press releases repeatedly referred to these high lime ores as not meeting the circular's specifications.[6] At no time was the exclusion of high lime waived by the Commission.

It follows from all that we have said that plaintiff is not entitled to recover with respect to ore failing to meet the

6. See the releases of July 10, 1949, and August 14, 1955 (prior to plaintiff's first ore-selling arrangement), of March 18, 1956, and of August 29, 1957.

6 percent lime test, but has proved compliance with Circular No. 5 as to all other ores—including (i) ore that met the 6% test but not the 3 to 1 test, and (ii) ore that met both tests.

It is suggested to us, however, that no recovery can be allowed, even for the ore which fulfilled the circular's demands, because the shipments of that ore were not in fact delivered under the circular but rather came under special contracts and were therefore not governed in any way by the circular. The contention is that the parties, in making the various agreements for the sale of plaintiff's ore (first to the A.E.C. and then to the licensed mills), recognized implicitly that the transactions were all separate and apart from Circular No. 5. We cannot agree. In the first place, the mere fact that plaintiff's sales were under contract is irrelevant to their coverage. As we have held, the circular definitely included eligible transactions which were required to be made by contract because the amounts exceeded 1,000 tons a year; plaintiff's sales always ran above that figure and consequently had to be made under agreement. Second, the mere fact that plaintiff's contracts included (in part) ineligible higher-lime ores would not remove the eligibility of the large amount of ore, sold under the same contract, which met the 6% test. For the sake of convenience all of the company's deliveries could be marshalled under contracts which had to contain the high lime penalty provision because much of the ore did have a high lime content. But plaintiff would not waive its rights under the Government's guarantee for ores fulfilling the conditions of Circular No. 5 because it also mined and shipped some non-eligible product or because both types happened to be blanketed under one agreement. The various contracts did not so state or imply. Nor have we been shown any A.E.C. regulation or practice which excluded a miner's eligible ores from the circular's coverage simply because he likewise produced ineligible, high lime, ores, or which put a producer on notice that he would have to separate his eligible from his unqualified ores and make separate contracts for each type.[7] We must conclude that Circular No. 5 and high lime producers were not mutually exclusive categories. One producer could mine and sell both kinds, and deal with them together in one contract, but of course he could count on the guarantee only for his eligible ore and would have to accept the penalty (or any other special A.E.C. demand) for the ineligible product.

Finally, there is no sufficient reason to believe that, at least before this vanadium dispute arose, either the plaintiff or the A.E.C. thought that the lumping of high lime with eligible ore under one agreement negated plaintiff's rights under Circular No. 5 with respect to the eligible variety. Certainly the company assumed the contrary. It always felt (as the trial commissioner found) that it had the right to obtain the guaranteed price for qualified ore (including the vanadium factor) either from the licensed private mills or directly from the A.E.C. See finding 13, note 6. It consistently demanded the guaranteed price for all the ore it deemed eligible and never acknowledged that Circular No. 5 was inapplicable. There is very little, if anything, tending to show that the A.E.C. felt differently—at least before the present dispute erupted. On the contrary, a letter from a Commission official in October 1956 referred generally to the sales made by plaintiff up to that time—the first contract, with its high lime provisions, had been signed in April 1956—as "under the provisions of Circular 5, Revised." In the later period, letters from Rare Metals and Texas-Zinc (the purchasing mills) also seem to reflect the assumption that their purchases were under the circular. Our appraisal is that, at least from 1956 to 1958 and probably thereafter, the A.E.C. and its licensees considered the eligible ores (i. e.

7. A.E.C. announcements that it would pay only for the uranium content of ores were always expressly restricted to products ineligible under Circular No. 5.

those meeting the 6% test) as being sold and purchased under the circular.

For these reasons we hold that plaintiff is entitled to recover with respect to all ores which met the 6% lime test, and judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c).[8]

NICHOLS, Judge (dissenting):

In his ultimate findings, now discarded by the court, the Trial Commissioner, Paul H. McMurray, reported that "no ores of plaintiff were ever purchased under the terms and specifications of Circular 5, because such ores did not meet the specifications of that Circular." I agreed. The court holds, however, that under the commissioner's findings of underlying facts, which it does not materially alter, a major part of plaintiff's ores were so purchased. I say major part on the basis of plaintiff's figures in its brief. If it is right, it has won its case as completely as most litigants expect to do, despite losing some debating points in the court's opinion. In further proceedings under Rule 47(c) the record already made will, I believe, permit a calculation of plaintiff's recovery. It will surely be substantial. How was it possible for such a divergence to occur?

The difficulty is, as shown in the settlement certificates in evidence in plaintiff's exhibit 38, that the lime content in plaintiff's shipments was not uniform. High in some shipments, it was low in others and apparently totally absent in some. The court views each separate shipment as a separate sale. The commissioner did not, as I construe his original report. The question is, as I see it, whether the guarantee in Circular 5 to pay for vanadium content, whether or not wanted or used, applies to a producer who never offered ore uniformly low in lime as the Circular required and never purported to be able to meet such a specification, whenever a separate shipment of his happened to meet it nevertheless.

The court achieves the result it deems just by interpreting out of existence a clause in Circular 5 which reads as follows:

(e) *Deliveries in excess of 1,000 tons per year.* Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year [this would have included plaintiff] will be required to enter into a contract with the Commission providing for, among other things, a rate of delivery and the total quantity of ore to be delivered.

The fact plaintiff made no contract directly with the Commission covering the period in litigation I consider the court has a satisfactory answer to. Behold, however, what the court also says:

Paragraph (e) merely provided that, for the convenience of the purchaser and the orderly carrying-on of processing, shipments in excess of 1,000 tons [per year, I presume] would be made under advance written arrangements as to time, rate, and amount of delivery.

Let us see what an important part of Paragraph (e) is thus invisible to the court. Obviously, one of the "other things" would have to be the matter of specifications. It is scarcely conceivable the Commission intended to make contracts without specifications. There would be a great difference between a

---

8. Plaintiff says the amount is $638,723.57. The defendant contends that any award will have to be credited with certain taxes the plaintiff is said to have saved as a result of the pattern of its arrangement with Texas-Zinc. Since, however, we find neither a counterclaim for such taxes nor any affirmative defense in the answer claiming recoupment, and the issue does not seem to have been tried as a tax matter, this asserted diminution in the award cannot be allowed. The trial commissioner has found, and we agree, that this type of arrangement with Texas-Zinc, which was for tax purposes, does not preclude vanadium payments to plaintiff under Circular No. 5. We leave undecided, for resolution in the proceedings under Rule 47(c), the defendant's minor claim of recoupment for copper payments.

seller who offered to deliver a given quantity meeting a given specification as to lime content, and one who offered to deliver the same quantity with mere willingness to take a penalty for excessive lime. The lime was penalized because it was thought to cause manufacturing difficulties. It would be just as difficult to schedule production in face of ignorance as to the lime content of future deliveries as it would be in face of ignorance as to time or quantity of such deliveries. Accordingly, I hold that Paragraph (e) definitely limits the commitment in Circular 5 to those who contract beforehand to deliver ore in a specified quantity meeting Circular 5 quality specifications, except as to producers of under 1,000 tons. The AEC made it clear in the note the court refers to that high-lime producers were to be dealt with under contracts, other than Paragraph (e) contracts.

The court further says:

The mere fact that plaintiff's sales were under contract is irrelevant to their coverage.

The court surely cannot imagine that plaintiff could have simply dumped in excess of 1,000 tons per annum at the door of the Monticello plant and have expected payment, without any contract, either under Circular 5 or under the various high-lime announcements, referred to in the findings, but this is what it seems to say, and has to say to maintain its position. That is, if the Commission took such dumped ore, it would have brought it under Circular 5 to the extent it was low in lime. Of course, there would be no objection to a single contract to deliver, as separate items, low-lime and high-lime ores, and Circular 5 would then cover the former. But I find Paragraph (e) an absolute unambiguous bar to extending the Circular 5 guarantee to low-lime ore shipments delivered under a high-lime contract. I think the court has read ambiguity into it to achieve the result it considers just. And perhaps the result is just, but a commitment to pay for unwanted and useless vanadium is not

exactly the kind of commitment to be extended beyond the carefully spelled out intention of its authors. At least, not in my view.

The court lays great stress on the subjective impressions of the plaintiff as to what its rights were. Yet plaintiff surely must have consulted counsel on a matter of such importance. We have no finding or request for a finding as to what counsel advised. If we start speculating what counsel would have advised, we meet ourselves coming back. This case reflects an instance of the alternation of wild extravagance and mean economy, too often typical in Government procurement policy. As long as the former phase continued, plaintiff's position was secure. But I for one would have advised that on the relapse to mean economy, inevitable sooner or later, the continuance of payment for unwanted and unused vanadium was hardly to be counted on. Plaintiff then would need a copper-riveted commitment, which Circular 5 would hardly have impressed me as being, with respect to plaintiff's operation at any rate. Plaintiff's subjective impressions and those of other parties were anticipations that the extravagant phase would continue, and not guides as to the extent of the guarantee legally enforceable when the mean phase set in.

Thus, in my opinion, Circular 5 was a commitment to pay for unused and unwanted vanadium only to small producers (under 1,000 tons a year) and producers who offered and contracted in advance to deliver ore in stated quantities on stated dates, meeting the specifications set forth in Circular 5 as to origin and chemical composition. Under that standard, the commissioner was right in finding that no ores of plaintiff were purchased under Circular 5, and plaintiff should not recover anything in this action.

Once litigation commences, parties sometimes labor to adorn the previously barren landscape with thickets of dubious contentions, many not previously heard of. This is rationalized on the theory that judges are unpredictable and no

one can tell what *ratio decidendi* will appeal to them. No doubt this is valid in its place, but it involves a risk. Before the court has ever cut its way to the real heart of the controversy, it may have formed a belief that the claim is supported by false facts and reasons, or that the defense is merely technical and inequitable. The court in breaking through the thicket may generate so much momentum it smashes right on into the plate-glass picture window. Gazing at the wreckage herein, I conceive that something of this kind has happened. Thanks to all the underbrush, 90% of the court's opinion would have been the same whichever side prevailed, and that 90% of course I would have joined in. I would have turned aside when the plate-glass was reached.